UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| GENSPERA, INC., | * | |
| Plaintiff and Counter-Defendant, | * | Civil Action No. MJG-12-772 |
| v. | * | |
| ANNASTASIAH MUDIWA MHAKA, | * | |
| Defendant and Counter-Plaintiff | * | |
| | * | |
| v. | * | |
| JOHN T. ISAACS and SAMUEL R. DENMEADE | * | |
| Counter-Defendants | | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## SECOND AMENDED ANSWER TO
## DECLARATORY JUDGMENT COMPLAINT

Annastasiah Mudiwa Mhaka ("Mhaka" or "Defendant"), hereby states her Second Amended

Answer to the Declaratory Judgment Complaint filed by GenSpera, Inc. ("GenSpera" or "Plaintiff"), and

alleges as follows:

### THE PARTIES

1.       Answering the allegations in Paragraph 1, Dr. Mhaka admits that GenSpera has its

principal place of business in San Antonio, Texas.  Dr. Mhaka denies that GenSpera is a corporation

organized under the laws of Texas.  As to the remaining allegations in this paragraph, Dr. Mhaka lacks

information sufficient to form a belief as to the truth of the allegations of that Paragraph, and on that basis, denies said allegations.

2. Answering the allegations in Paragraph 2, Dr. Mhaka denies that GenSpera's license to the named patents is exclusive, alleges on information and belief that GenSpera has certain license rights to the patents, and as to the remaining allegations in this paragraph, lacks knowledge or information sufficient to admit or deny the allegations of that paragraph, and on that basis, denies said allegations.

3. Answering the allegations in Paragraph 3, Dr. Mhaka admits said allegations.

4. Answering the allegations in Paragraph 4, Dr. Mhaka admits said allegations.

5. Answering the allegations in Paragraph 5, Dr. Mhaka admits that she is an individual residing in Baltimore, Maryland, and denies the remaining allegations in this Paragraph.

## JURISDICTION AND VENUE

6. Answering the allegations in Paragraph 6, Dr. Mhaka admits said allegations.

7. Answering the allegations in Paragraph 7, Dr. Mhaka admits said allegations.

8. Answering the allegations in Paragraph 8, Dr. Mhaka admits said allegations.

9. Answering the allegations in Paragraph 9, Dr. Mhaka admits said allegations.

## BACKGROUND

10. Answering the allegations in Paragraph 10, Dr. Mhaka denies that John Isaacs and Sam Denmeade are the sole inventors, and as to the remaining allegations in said paragraph admits said allegations.

11. Answering the allegations in Paragraph 11, Dr. Mhaka admits that in one embodiment of the invention described in the '354 patent a naturally occurring compound (thapsigargin) is modified to form a derivative containing a five-amino-acid-long peptide that reacts specifically to

PMSA, and that this is found on the surface of blood vessels associated with cancers, as well as on other locations, and admits also that the peptide is cleaved in certain ways.  As to the remaining allegations in this Paragraph, Dr. Mhaka lacks knowledge or information sufficient to admit or deny the allegations of that Paragraph, and on that basis, denies said allegations.

12.     Answering the allegations in Paragraph 12, Dr. Mhaka alleges that the '354 patent contains composition claims, denies that John Isaacs and Sam Denmeade are the sole inventors, and otherwise admits the allegations in this Paragraph.

13.     Answering the allegations in Paragraph 13, Dr. Mhaka admits said allegations.

14.     Answering the allegations in Paragraph 14, Dr. Mhaka admits said allegations.

15.     Answering the allegations in Paragraph 15, Dr. Mhaka alleges that John Isaacs and Sam Denmeade are not the sole inventors of the technology described and claimed in the '354 and '648 patents, and otherwise admits the allegations in this Paragraph.

16.     Answering the allegations in Paragraph 16, Dr. Mhaka alleges that the correct starting date with the Cellular and Molecular Medicine Department is 1999 rather than 2000 as alleged, and that her official research advisor was John Isaacs, and that Sam Denmeade was her "unofficial," but more active and immediate advisor, but otherwise admits said allegations.

17.     Answering the allegations in Paragraph 17, Dr. Mhaka alleges on information and belief that GenSpera is the assignee of the interests of Johns Hopkins, John Isaacs and Sam Denmeade in the '354 and '648 patents, and as to the remaining allegations in this paragraph lacks information sufficient to form a belief as to the truth of the allegations of that Paragraph, and on that basis, denies said allegations.

18.     Answering the allegations in Paragraph 18, Dr. Mhaka alleges on information and belief that GenSpera is the assignee of the interests of Johns Hopkins, John Isaacs and Sam Denmeade in the '354 and '648 patents, and as to the remaining allegations in this paragraph lacks information sufficient to form a belief as to the truth of the allegations of that Paragraph, and on that basis, denies said allegations.

19.     Answering the allegations in Paragraph 19, Dr. Mhaka lacks information sufficient to form a belief as to the truth of the allegations of that Paragraph, and on that basis, denies said allegations.

20.     Answering the allegations in Paragraph 20, Dr. Mhaka alleges on information and belief that GenSpera is the assignee of the interests of Johns Hopkins, John Isaacs and Sam Denmeade in the '354 and '648 patents, denies that GenSpera has an exclusive license to the patents or exclusive rights to prosecute, maintain and enforce the patents, and as to the remaining allegations in this paragraph lacks information sufficient to form a belief as to the truth of the allegations of that Paragraph, and on that basis, denies said allegations.

## DECLARATORY JUDGMENT JURISDICTIONAL FACTS

21.     Answering the allegations in Paragraph 21, Dr. Mhaka admits said allegations.

22.     Answering the allegations in Paragraph 22, Dr. Mhaka admits said allegations.

23.     Answering the allegations in Paragraph 23, Dr. Mhaka admits said allegations.

24.     Answering the allegations in Paragraph 24, Dr. Mhaka admits said allegations.

25.     Answering the allegations in Paragraph 25, Dr. Mhaka lacks sufficient information to admit or deny that a conversation took place on exactly February 17, 2012, and on that basis denies that allegation, alleges that a conversation took place on or about February 17, 2012, alleges that the

conversation recited in this paragraph is substantially correct, and as to the remaining allegations in the paragraph lacks information sufficient to form a belief as to the truth of the allegations of that Paragraph, and on that basis, denies said allegations.

26.     Answering the allegations in Paragraph 26, Dr. Mhaka admits said allegations.

27.     Answering the allegations in Paragraph 27, Dr. Mhaka admits said allegations.

28.     Answering the allegations in Paragraph 28, Dr. Mhaka admits that her counsel sent an email that day, admits that the quote is accurate, denies that the email was "threatening," and denies the remaining allegations in that paragraph.

29.     Answering the allegations in Paragraph 29, Dr. Mhaka admits said allegations.

30.     Answering the allegations in Paragraph 30, Dr. Mhaka admits said allegations.

31.     Answering the allegations in Paragraph 31, Dr. Mhaka lacks information sufficient to form a belief as to the truth of the allegations of that Paragraph, and on that basis, denies said allegations.

32.     Answering the allegations in Paragraph 32, Dr. Mhaka admits said allegations.

## COUNT I

### DECLARATORY JUDGMENT AS TO CORRECT INVENTORSHIP OF THE CLAIMS OF THE '354 PATENT

33.     Dr. Mhaka restates and realleges her answers to Paragraphs 1 through 32 of Dr. Mhaka's answer above as if set forth fully herein.

34.     Answering the allegations in Paragraph 34, Dr. Mhaka lacks information sufficient to form a belief as to the truth of the allegations of that Paragraph, and on that basis, denies said allegations.

35.     Answering the allegations in Paragraph 35, Dr. Mhaka lacks information sufficient to form a belief as to the truth of the allegations of that Paragraph, and on that basis, denies said allegations.

36.     Answering the allegations in Paragraph 36, Dr. Mhaka denies said allegations.

37.     Answering the allegations in Paragraph 37, Dr. Mhaka admits that GenSpera seeks the stated relief, but denies that GenSpera is entitled to such relief and denies each and every remaining allegation in that Paragraph.

## COUNT II

## DECLARATORY JUDGMENT AS TO CORRECT INVENTORSHIP OF THE CLAIMS OF THE '648 PATENT

38.     Dr. Mhaka restates and realleges her answers to Paragraphs 1 through 37 of Dr. Mhaka's answer above as if set forth fully herein.

39.     Answering the allegations in Paragraph 39, Dr. Mhaka lacks information sufficient to form a belief as to the truth of the allegations of that Paragraph, and on that basis, denies said allegations.

40.     Answering the allegations in Paragraph 40, Dr. Mhaka lacks information sufficient to form a belief as to the truth of the allegations of that Paragraph, and on that basis, denies said allegations.

41.     Answering the allegations in Paragraph 41, Dr. Mhaka denies said allegations.

42.     Answering the allegations in Paragraph 42, Dr. Mhaka admits that GenSpera seeks the relief stated in said Paragraph.  Dr. Mhaka denies that GenSpera is entitled to said relief, and denies each and every allegation remaining in said Paragraph.

**PRAYER FOR RELIEF**

Answering GenSpera's Prayer for Relief, Dr. Mhaka denies that GenSpera is entitled to any of the relief it requests, including the relief GenSpera requests in its paragraphs (a) through (d) of its Prayer for Relief, and prays that GenSpera take nothing by its Complaint.

### ANNASTASIAH MUDIWA MHAKA'S SECOND AMENDED COUNTERCLAIMS AGAINST GENSPERA, INC., JOHN ISAACS AND SAMUEL DENMEADE, JURY TRIAL DEMANDED

Counter-plaintiff Annastasiah Mudiwa Mhaka ("Mhaka"), for her second amended counterclaim against GenSpera, Inc. ("GenSpera"), John T. Isaacs, Ph.D. ("Dr. Isaacs") and Samuel R. Denmeade, M.D. ("Dr. Denmeade") (GenSpera, Dr. Isaacs and Dr. Denmeade collectively the "Defendants"), hereby, pursuant to Court order, *see* Memorandum and Order Re: Procedural Matters, Dkt . No. 59 at §III,4, sets out the claims presented by her Complaint in MJG-12-3302 against Defendants:[1]

## I.   **INTRODUCTION**

1.      Dr. Mhaka brings this complaint seeking damages and other relief for the injury caused to her by the Defendants when they misappropriated her rights in an invention—an invention the Defendants have falsely and improperly claimed as solely resulting from their contributions alone. Through independent investigation, Dr. Mhaka made significant and novel inventive contributions to the inventions claimed in U.S. Patent Nos.7,468,354 ("'354 Patent") and 7,767,648 ("'648 Patent") (collectively the "Patents"). She proved the hypothesis of the named inventors flawed, postulated a new hypothesis, conceived a critical component of the compound claimed in the Patents, and ultimately made ("synthesized") the compound claimed in the Patents, named AMM9, after Plaintiff's initials. Yet, Dr.

---

[1] Dr. Mhaka makes these allegations on personal knowledge as to her own acts, and on information and belief as to all other matters.

Mhaka was not named as an inventor on these Patents.  Rather, Defendants added her invention to their preexisting patent applications, and now claim it as their own.

## II.    JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction over this matter by virtue of 28 U.S.C. §§ 1331 and/or 1338(a).  *See* Memorandum and Order Re: Procedural Matters, Dkt . No. 59 at §II,A. This Court has personal jurisdiction over the Defendants, and venue is proper in this District.  Defendant GenSpera is present and does business in Maryland.  Two of its senior consultants, Drs. Isaacs and Denmeade, work and live in Maryland.  The work leading to Dr. Mhaka's creation and synthesis of the compound in question was all performed in Maryland.  Many of the Defendants' actions in misappropriating the compound occurred in Maryland.  GenSpera has been personally present in Maryland for countless meetings.

## III.    THE PARTIES

3.     Dr. Mhaka is an individual residing in Baltimore City, Maryland.

4.     Dr. Mhaka has a Ph.D. in Cellular and Molecular Medicine from the Johns Hopkins School of Medicine, and a B.Sc. in Chemistry from the University of Pittsburgh.  Dr. Mhaka received her primary and secondary education in Zimbabwe, where she grew up during the 1980s and 1990s.

5.     Dr. Mhaka's early experiences in Zimbabwe shaped the educational trajectory she would pursue.  As a child, she saw loved ones succumb to preventable disease.  She understood the importance of disease prevention and cure, and set out on a decade's long path that would ultimately give her the education and position to work to combat disease.

6.      Today, Dr. Mhaka is employed in Johns Hopkins Medicine's business development office where she works closely with faculty and school leadership to identify and develop external partnerships that will benefit Johns Hopkins Medicine and its affiliates.

7.      GenSpera is a Delaware corporation, with its principal place of business in San Antonio, Texas.  It does business in Baltimore City, several of its key consultants work in Baltimore City and live elsewhere within the State of Maryland, and the events underlying this action primarily took place in Baltimore City.

8.      GenSpera is a publicly traded drug development company.

9.      GenSpera develops drugs through Phase I or II clinical trials and then seeks to license those drugs to third parties.

10.     GenSpera's lead drug candidate is currently in Phase I trials.

11.     GenSpera's lead candidate is called G-202.  GenSpera describes G-202 as the cell-killing agent "12ADT" with an attached targeting/masking peptide.  GenSpera equates G-202 to a grenade whereby its peptide is the pin.  According to GenSpera, when G-202 hits the target, for example, the blood vessels supplying tumors, an enzyme associated with that target pulls the pin and cleaves the peptide, thereby releasing the killing agent, which then kills the target cell.

12.     G-202 is covered by the Patents:  GenSpera does not dispute this fact, and GenSpera identifies G-202 in connection with the '354 and '648 Patents on its website.

13.     G-202 is the compound conceived and synthesized by Dr. Mhaka, which is also referenced as AMM9.  GenSpera does not dispute this fact.

14.     Dr. Isaacs is a professor of oncology at the Johns Hopkins Sidney Kimmel Comprehensive Cancer Center and a professor of urology at the Johns Hopkins School of Medicine.  Dr. Isaacs is a senior consultant for GenSpera.  Dr. Isaacs resides in Phoenix, Maryland.

15.     Dr. Denmeade is a professor of oncology, urology and pharmacology at the Johns Hopkins Sidney Kimmel Comprehensive Cancer Center.  Dr. Denmeade is a senior consultant for GenSpera.  Dr. Denmeade resides in Ellicott City, Maryland.

## IV.   STATEMENT OF THE FACTS

### A.   Cancer and PSMA

16.     Various forms of cancer remain a leading cause of death, and effective cancer treatments are more of a promise than a reality.  Many common cancer treatments, chemotherapies, target actively dividing cells.  By targeting cell division, these therapies are somewhat less toxic, or rather, tolerably toxic, relative to normal healthy cells.  This is so because most cells are not actively dividing, while many forms of cancer cells are dividing wildly.  By targeting cell division, chemotherapies differentiate against cancer cells, at least theoretically.  If the chemotherapeutic agent were not so targeted, it would be equally toxic to all cells, cancerous and otherwise.

17.     Some forms of cancer, however, do not divide rapidly and may indeed grow slowly.  Cancer cells in this state are indolent and not as aggressive as those actively dividing.  Nonetheless, indolent cancers often prove fatal.

18.     Prostate cancer accounts for one third of all cancers in American males, and is a disease that one in five men will develop.  Localized prostate cancer is readily curable while metastatic prostate cancer is not; the five year survival rate for metastatic prostate cancer approximates 29%.

19.     Currently, there are no effective treatments for recurring metastatic prostate cancer—at this stage the disease is uniformly fatal. Sufferers of recurrent metastatic prostate cancer typically undergo standard chemotherapy along with androgen ablation. Androgen is the generic term for male developmental hormones, *e.g.*, testosterone. Eliminating these hormones through chemical castration can kill actively dividing malignant prostate cancer cells. Androgen treatment in conjunction with standard chemotherapy targets the most aggressive of the cancerous cells, and may prolong a patient's life.

20.     This conjoint therapy is ultimately ineffective, however, owing to the presence of indolent cancer cells. If the cancer cells are not actively dividing, they tend also to be androgen independent, and are thereby unabated by either chemical castration or chemotherapy. These cells, more slowly, but surely, bring about death.

21.     The lower specificity of standard chemotherapeutic agents for non-actively dividing cancer cells can generally be overcome by increasing the concentration of the drug agent. However, higher concentrations mean greater systematic toxicity, *i.e.*, at these concentrations the agent begins to kill normal cells indiscriminately.

22.     Prostate specific membrane antigen ("PSMA") is a transmembrane glycoprotein with exo-cellular exposure. Antigens expressed on cellular surfaces often serve as receptors, allowing other compounds to attach to the cell surface. These molecules may also serve a transport function, facilitating the transport of substances across the cell membrane. The exact function of PSMA is not understood, but PSMA's coding sequence shares some similarities with a known receptor/transport molecule.

23.     PSMA is highly expressed (*i.e.* present) in prostate cancer cells—more so than in normal prostate cells, and much more so than in other normal cell types.  PSMA's expression is not limited to cancerous prostate cells, however.  PSMA is also modestly expressed in the neovasculature (servicing blood vessels) of prostate tumors and in a variety of other cancer cell types and/or their neovasculature, including: breast, renal, colon, pancreatic, melanoma, lung and testicular cancer cells.

24.     Given that PSMA is closely associated with a variety of cancer cell types, and given its potential role as a receptor, PSMA is an excellent target for chemotherapeutics specific to cancer cells.

### B.      The Plant Toxin Thapsigargin

25.     Thapsigargin is a naturally occurring compound present in the plant *Thapsia garganica*, a compound with long-recognized medicinal properties.

26.     Thapsigargin is a cytotoxin capable of initiating apoptosis across cell types.  Apoptosis is a biochemical process that culminates in cell death.  Thapsigargin acts by inhibiting Sacro/Endoplasmic Reticulum $Ca^{2+}$ ATPase ("SERCA") pumps; the resulting fluctuation in calcium ion concentration signals cellular death, initiating apoptosis.

27.     Significantly, thapsigargin's method of action is cell cycle independent; it will initiate apoptosis regardless of whether a cell is actively dividing or not.  As such, thapsigargin kills cancerous and normal cells alike.  Thapsigargin's indiscriminate nature makes for a great poison but a poor chemotherapeutic agent.

28.     Further, thapsigargin is hydrophobic; it is not readily soluble and will remain localized at the site of administration into the body.

C.     **Prodrugs**

29.     Chemotherapy efficacy can be improved by selectively delivering a drug to cancerous cells.  The ability to target a drug reduces systemic cytotoxicity while permitting increases in dosage concentration and frequency.  The net effect is a safer and more effective cancer treatment.

30.     One strategy for such targeted drug delivery lies in prodrugs.  In this approach, the treatment agent has two forms: the "prodrug," which is relatively non-toxic, and the "drug," which is highly toxic.  The key is to deliver the prodrug (non-toxic) systematically, but have it converted to the drug (toxic) only at tumor sites; once toxic, it must stay where targeted.  In this fashion, cancer cells receive the toxin, the drug, while normal cells see only the relatively benign substance, the prodrug.

31.     For this approach to work, a drug candidate must be efficiently and specifically activated within the microenvironment of the targeted tumors; in other words, something both only and readily present at the target tumors must convert the prodrug to drug, *i.e.*, something uniquely associated with cancer cells must be the key that unlocks the drug's toxicity.

D.     **Drs. Isaacs and Denmeade's Plasma Stability Hypothesis**

32.     Drs. Isaacs and Denmeade have been professors and researchers at the Johns Hopkins School of Medicine and/or its affiliates at all times relevant hereto.

33.     Drs. Isaacs and Denmeade have researched PSMA and explored its potential as a prodrug target.

34.     In this regard, Drs. Isaacs and Denmeade developed a prodrug model whereby an inactive analog of thapsigargin would be delivered to the site of metastatic prostate cancer cells.  The prodrug would be converted to the active compound, the drug, at the metastatic prostate cancer cell sites by PSMA, the target.

35.     The foundation of the prodrug was to be 8-*O*-(12Aminododecanoyl)-8-*O*-

debutanoylthapsigargin ("12Adt").  This compound represents a modification of the thapsigargin

molecule to produce a long 12-amino dodecanoate side chain.  This chain is significant, as it allows for

the addition of short amino acid sequences, peptides, to the molecule, but preserves the non-specific, cell

cycle independent, apoptotic inducing capability of thapsigargin.  It was further determined that 12Adt

with a single aspartate ("Asp") or glutamate ("Glu") residue (specific types of amino acids) attached via

the side chain ("12Adt-Asp" and "12Adt-Glu" respectively) also retained the toxic characteristics

associated with the naturally occurring analog; and thus, 12Adt-Asp and 12Adt-Glu would assume the

"drug" role for therapeutic agents proposed under their hypothesis.

36.     The ability to attach a peptide chain to 12Adt, and getting that peptide chain right, was

significant, because it was the peptide sequence that would: confer specificity for PSMA (PSMA would

be able to recognize the prodrug as a substrate, *i.e.*, something acted upon in a biochemical reaction),

ensure efficient activity by PSMA (PSMA would be able to turnover prodrug quickly resulting in a high

drug yield), render the therapeutic candidate relatively non-toxic (the 12Adt with the appropriate peptide

sequence attached would be unable to effectively inhibit SERCA pumps), and render the therapeutic

candidate water soluble (the prodrug could be carried around in the blood stream, and thus transported to

cancer sites after non-site specific delivery).  No peptide sequence means no prodrug, while the wrong

peptide sequence produces an ineffective prodrug.

37.     Drs. Isaacs and Denmeade believed PSMA to be an exopeptidase, *i.e.*, an enzyme with

the ability to cleave sequentially amino acids in a peptide chain.  They further recognized that PSMA

possessed dual catalytic activity and sought to exploit this activity in designing a peptide sequence that

would uniquely target PSMA.  PSMA has the catalytic properties of an N-acetylated α-linked acidic di-

peptidase ("NAALADase"), so will efficiently cleave alpha-linked di-peptides, and of a pteroyl poly-γ-glutamyl carboxypeptidase, allowing for the cleavage of gamma-linked peptides.[2]

38.     Drs. Isaacs and Denmeade were aware of a blood plasma protein, gamma glutamyl hydrolase ("GGH"), which possessed similar gamma-linkage exopeptidase activity as PSMA.  It was thus paramount that the prodrug be a substrate for PSMA and not GGH—if not, the prodrug would be unstable in blood, *i.e.*, GGH would convert the prodrug to the active toxin, which would then localize in the vicinity of healthy cells and kill them.

39.     An additional concern was the known existence of a NAALADase in brain tissues which served in the breakdown of the neuropeptide N-Acetyl-l-Aspartyl-l-Glutamate to the neurotransmitters glutamate and N-acetyl-aspartate.

40.     Given the existence of these singular enzymatic properties in normal tissues,[3] Drs. Isaacs and Denmeade determined that an acceptable PSMA activated drug candidate for metastatic prostate cancer treatment would need to be **stable** when confronted with a single enzymatic activity demonstrated by its target, but **hydrolysable** when exposed to its target's enzymatic activities.

41.     With this starting point, Drs. Isaacs and Denmeade began work to validate and refine the PSMA activated prodrug model.  Importantly, these preliminary investigations did not use 12Adt, but rather, a methotrexate-based analog, 4-N[N-2,4-diamino-6-pteridinyl-methyl)-N-methylamino-benzoate]

---

[2] There are different ways in which an amino acid can be bound to another amino acid in forming a peptide based upon the position of the peptide group, the linking moiety of atoms characteristic of proteins, in relation to carbon atoms in one of the two amino acid residues.  These varying configurations are named using Greek letters.  The first three possible configurations: alpha, beta and gamma are of relevance here.  In short hand structural formulas alpha linkages will be designated by a "-," beta linkages by a "$," and gamma linkages by a "*."

[3] It would be later determined that PSMA, NAALADase, and certain other characterized activities (folate hydrolase and GCPII) are encoded by the same gene, essentially having similar enzymatic activity and specificity despite expression in different tissues.

("APA"), as a surrogate for 12Adt.  APA was bound to various alpha linked di-peptides, gamma linked

tri-peptides, gamma-linked penta-peptides, and mixed gamma and alpha linked penta-peptides.  These

various peptide/APA combinations represented potential prodrug candidates and controls.  These

candidates were tested for PSMA hydrolysis and plasma hydrolysis.  A high rate of PSMA hydrolysis

indicated that the peptide sequence was being effectively cleaved by PSMA down to the active toxin, a

beneficial thing; a high plasma yield indicated that the peptide was also being effectively converted to

the active toxin by blood enzymes, and thus was unstable in the blood, all unacceptable.

42.     The test results for three of the tested peptide/APA combinations were significant.  APA

linked to the di-peptide Asp-Glu showed 99% hydrolysis by PSMA and 1% hydrolysis in plasma; APA

linked to the gamma penta-peptide Glu*Glu*Glu*Glu*Glu showed 100% PSMA hydrolysis and 72%

plasma hydrolysis; APA linked to the mixed gamma and alpha linked penta-peptide Asp-Glu*Glu*Asp-

Glu showed 77% PSMA hydrolysis and was not hydrolyzed in plasma.

43.     Based on these results, and the dual activity requirement, Drs. Isaacs and Denmeade

formulated a hypothesis that suggested specific peptide sequences that would bind to 12Adt and so yield

ideal prodrug candidates.  While PSMA liked both gamma linked glutamate chains and alpha linked

Asp-Glu di-peptides, blood enzymes also liked gamma linked glutamate chains, but could not cleave

alpha Asp-Glu linkages.  But, just Asp-Glu was a chancy proposition owing to NAALADase activity

characterized in other tissues, and because, owing to its shorter sequence, it was possibly less soluble.

Since blood enzymes such as GGH could only cleave amino acids sequentially, gamma linked glutamate

residues, which PSMA cleaved both specifically and efficiently, could be used, if they were protected by

an alpha Asp-Glu cap at the C-terminus end (the end of the peptide exposed for sequential cleavage).[4]

Hence, they reasoned, good prodrug candidates should have an alpha linked Asp-Glu cap on the C-terminus end of their peptide sequences, followed by a series of alpha/gamma linked amino acids. This was, at least, their hypothesis.

44.     They were wrong.

**E.      Dr. Mhaka Synthesizes the Pivotal Compound**

45.     Dr. Mhaka joined the Johns Hopkins School of Medicine Cellular and Molecular Medicine Department in 1999 as a doctoral candidate, and continued through to graduation in 2005. For much of her time in the Cellular and Molecular Medicine Department, Dr. Mhaka worked in Dr. Isaacs' lab with Dr. Isaacs as her official advisor and Dr. Denmeade as her unofficial, but more active and immediate advisor.

46.     Dr. Mhaka justifiably placed special trust and confidence in Drs. Isaacs and Denmeade as her advisors.

47.     With the preliminary APA based test results, and Drs. Isaacs and Denmeade's hypothesis, Dr. Mhaka set out to synthesize and test actual peptide/12Adt conjugates.

48.     Dr. Mhaka—first designing a synthetic route for 12Adt/pentapeptide conjugates—first synthesized the compounds she named AMM1 and AMM2 where "AMM" referenced her initials. AMM1 was 12Adt linked to the peptide Asp-Glu*Glu*Asp-Glu, a compound she had been directed to synthesize by Dr. Denmeade—his and Dr. Isaacs' lead prodrug candidate as determined by applying

---

[4] Asp-Glu as used to refer to an alpha linked aspartate and glutamate cap includes both a cap where the cap's glutamate residue occupies the C-terminal position of the peptide sequence, and a cap where the cap's aspartate residue occupies the C-terminal position. Drs. Isaacs and Denmeade also reasoned that a different alpha linked dipeptide, Asp-Gln (where Gln represents the amino acid glutamine), may also be suitable as a capping dipeptide to guard against GGH cleavage.

their hypothesis in conjunction with their preliminary APA data. AMM2 was meant to serve as the test's control, and was the di-peptide Asp-Glu linked to 12Adt. Dr. Mhaka evaluated the hydrolysis profiles for both these compounds, and was shocked by the results she obtained.

49.     AMM1's hydrolysis by PSMA stood at a mere 17%—AMM1, her advisors lead drug, was a poor PSMA substrate. AMM1's plasma profile was as expected, it was plasma stable. As for AMM2, it was a good PSMA substrate at 88% hydrolysis and was plasma stable.

50.     Dr. Mhaka's AMM1 and AMM2 experimentation results were discussed with her advisors. The conversation centered around 12Adt linked to the penta-peptide Glu*Glu*Glu*Glu*Glu, as the then existing literature dictated that a 12Adt/peptide conjugate containing this non-Asp-Glu capped amino acid sequence should be the be-all-end-all PSMA substrate, i.e., it should be highly efficiently hydrolyzed by PSMA (but, per the preliminary APA studies, susceptible to non-PSMA specific hydrolysis). Thus, 12Adt linked to the penta-peptide Glu*Glu*Glu*Glu*Glu ("AMM5") was jointly conceived by Drs. Mhaka, Isaacs and Denmeade as a positive control for 12Adt/peptide conjugate work.

51.     Dr. Mhaka then reasoned that the preliminary APA data having not been indicative of 12Adt behavior a series of peptide/12Adt compounds should be synthesized for use in testing PSMA cleavage behavior. Dr. Mhaka on her own initiative, and drawing on her past experiences, including her bachelor's degree in chemistry and her graduate pharmacology classes, proceeded to conceive of 12Adt linked to the penta-peptide Asp-Glu*Glu*Glu-Asp ("AMM3"), 12Adt linked to the penta-peptide Asp-Glu*Glu*Glu-Glu ("AMM4"), 12Adt linked to the penta-peptide Glu*Glu*Glu*Asp-Glu ("AMM7"), and 12Adt linked to the penta-peptide Glu*Glu*Glu*Glu-Asp ("AMM8"), as test subjects to help inform the hydrolysis profile of 12Adt prodrugs (it was of course realized, at the time of conception, that one of

these compounds could be revealed as a lead prodrug in and of itself). She then synthesized AMM5, AMM3, AMM4, AMM7 and AMM8.

52.     On hydrolyzing her compounds with PSMA, Dr. Mhaka discovered that they were displaying different hydrolysis characteristics, *i.e.*, they were being cleaved differently by PSMA. Dr. Mhaka deduced that the different rates for the different compounds came as a result of PSMA sticking at various amino acid positions rather than cleaving sequentially through the entire sequence for each AMM type.

53.     AMM5 showed a PSMA hydrolysis rate of 18%. This was unexpected, as her advisors had thought that long chains of gamma linked glutamates represented a particularly good PSMA substrate—the APA analog had demonstrated a fast cleavage rate (PSMA hydrolysis at 100% in fact). Yet, Dr. Mhaka's results indicated that there was little cleavage by PSMA down to the final active toxin, 12Adt linked to Glu. Through further pharmacokinetic analysis she discovered that while PSMA made short work of the first three amino acids in the sequence it was getting stuck at the last two leaving 12Adt linked to Glu*Glu. Equally surprising and directly contrary to her advisors' hypothesis, AMM5, a non alpha capped much less Asp-Glu capped conjugate, was completely plasma stable. The implication she realized was that no alpha cap was needed, and she went on to show that all 12Adt prodrugs were plasma stable. This realization essentially changed the design and selection criteria for prodrug candidates to rely solely on the rate of PSMA hydrolysis.

54.     Not only did Dr. Mhaka realize that the alpha Asp-Glu cap was not needed, but she discovered that the penta-pedtides so capped represented a poorer PSMA substrate than the non-capped penta-peptides—of the penta-peptides AMM5, a non-alpha capped penta-peptide, possessed a not impressive, but still the highest, PSMA hydrolysis rate.

55.     With particular attention to the peptide sequences of the two AMMs which had shown the highest PSMA hydrolysis rates to date, AMM2 at 88% and AMM5 at 18%, and based on her experience as a chemist combined with results gleamed from enzyme kinetics and plasma stability results, for example, where it was PSMA was getting stuck, Dr. Mhaka conceived, synthesized and reduced-to-practice the final conjugate, AMM9, in the latter half of 2003.

56.     AMM9 consisted of 12Adt bond to the penta-peptide Asp-Glu*Glu*Glu*Glu.  Dr. Mhaka chose this amino acid sequence based on the efficient portions of AMM5 and AMM2: AMM2's Asp-Glu di-peptide was efficiently cleaved and was plasma stable, while AMM5 was efficiently cleaved up to a gamma-linked di-peptide, i.e., the first three amino acids in its sequence, Glu*Glu*Glu*, were efficiently cleaved, and AMM5 was plasma stable.

57.     AMM9 yielded impressive initial results with PSMA hydrolysis of 84%, and it was plasma stable.  Thus, AMM9, in addition to AMM2, became the lead prodrug candidates on which further tests were to be performed.  Further testing led to the ultimate conclusion that AMM9 exhibited the highest therapeutic index in cell-lines and animal prostate cancer models, thus solidifying it alone as the drug candidate.

58.     AMM9 could not have been selected as the prodrug under Drs. Isaacs and Denmeade's hypothesis as it was a penta-peptide without an alpha Asp-Glu cap (or for that matter any sort of alpha dipeptide cap).  According to their hypothesis such a compound should have been readily cleaved by GGH thereby releasing active toxin into the blood stream—an AMM9 based prodrug model should have resulted in systemic toxicity and no cancer specific targeting.

59.     Without Dr. Mhaka's significant inventive contributions the benefits of using AMM9, or a highly similar peptide/12Adt conjugate (one with an identical amino acid sequence to AMM9, but with different bond types) would not have been claimed.

60.     Much of what Dr. Mhaka did in synthesizing and characterizing AMM1 and AMM2, and developing, synthesizing and characterizing the remainder of the AMM series, including AMM9, is recounted in her dissertation.

**F.     The Composition Claim is Directed to AMM9 and the Novel Aspect of the Method Claim is the Use of AMM9**

61.     The '354 Patent contains two claims.  Independent Claim 1 is directed to a particular prodrug, while dependent Claim 2 is directed to a pharmaceutical preparation containing the prodrug of Claim 1.

62.     The claim which ultimately issued as Claim 1 of the '354 Patent first appeared in the prosecution in a preliminary amendment and response to a restriction requirement dated November 3, 2006.  This is six years after the inventors filed a provisional application the benefit of which the '354 Patent asserts, and nine years after Dr. Isaacs claimed to have discovered AMM9.

63.     '354's Claim 1 is substantially directed towards AMM9, and was added for the purpose of claiming this novel compound and proven lead prodrug candidate.

64.     '354's Claim 1 claims a compound comprising 12Adt linked to the aspartate residue of a peptide having the sequence Asp-Glu*Glu*Glu*Glu where at least one of the bonds designated with a "*" is a gamma linkage.  The claim does not mandate the type of linkage that must be present between the remaining glutamate residues, nor does the plain language of the claim itself specify the type of

linkage that must couple the peptide to 12Adt.[5]  The specific structure of AMM9 is: 12Adt$Asp-Glu*Glu*Glu*Glu.  Thus, AMM9 is covered by '354's Claim 1. '354's Claim 1 also covers AMM4 (12Adt$Asp-Glu*Glu*Glu-Glu, which was demonstrated to be a poor drug candidate), in addition to five other compounds.

65.     Dr. Mhaka was the first to conceive a compound covered by '354's Claim 1; Dr. Mhaka was the first to reduce-to-practice a compound covered by '354's Claim 1.

66.     None of the compounds covered by '354's Claim 1 contain an Asp-Glu cap—'354's Claim 1 does not cover prodrug candidates that follow Drs. Isaacs and Denmeade's Asp-Glu cap-centric hypothesis, rather, the claims cover the novel contributions of Dr. Mhaka's rationale, which found its impetus in AMM9.  Dr. Mhaka is a joint inventor of the invention claimed as '354's Claim 1.

67.     It follows that Dr. Mhaka is a joint inventor of the invention claimed in '354's Claim 2, as that claim's novelty lies in the prodrug used in the pharmaceutical composition.

68.     The same is true for claims 1-11 of the '648 Patent.  Claim 1 of '648 is independent; the remaining claims all depend from '648's Claim 1.

69.     648's Claim 1 covers a method for treating particular cancers using a composition comprising an effective amount of 12Adt linked to the aspartate residue of a peptide having the sequence Asp-Glu*Glu*Glu*Glu where at least one of the bonds designated with a "*" is a gamma linkage, i.e., a composition covered by the '354 Patent.

70.     PSMA expression had been previously documented in various cancers and/or their neovasculature, so it was readily appreciable that a prodrug developed for prostate cancer, which was

---

[5] However, given that the Asp residue has an alpha linkage with the adjacent Glu residue the 12Adt linkage would be a beta linkage as a practical consequence of which carbon positions are left open on the Asp residue.

targeted to PSMA, could be used against other forms of cancer or the neovasculature of certain tumors. It follows that the novelty of all the '648 claims rests with the prodrug used in the treatment method; a prodrug composition derived from Dr. Mhaka's contributions.  Dr. Mhaka is a joint inventor of the inventions claimed in the '648 Patent.

G.   **Despite Her Significant Inventive Contributions Dr. Mhaka Was Not Named as an Inventor**

71.    Despite her significant and novel contributions as described above; her having received a young investigator award from the American Association for Cancer Research for her AMM9 work; her appearing as an author on scientific articles describing PSMA targeted prodrugs; and her having written her dissertation on the lead-up to and synthesis of AMM9 and follow-up work confirming AMM9 as an ideal drug candidate; Dr. Mhaka was left off of the patents as a named inventor.

72.    Based on her initial conception and synthesis of AMM9 Dr. Mhaka prepared a poster presentation, as she planned to present her results at an American Association for Cancer Research symposium in early 2004.  Pressed for time, but mindful that she should have one of her advisors review her presentation, she left the board outside of Dr. Denmeade's office for review.  When she returned to collect the board the next morning, the structure for AMM9 had been physically cut out of the presentation.  By way of email dated on or about March 2004 Dr. Denmeade explained that AMM9 had not been specifically claimed in a provisional application, the application which ultimately issued as the '354 Patent, and thus he advised Dr. Mhaka not to publish AMM9's structure.  Dr. Denmeade further explained that the provisional application in question had been filed before Dr. Mhaka's time with Dr. Isaacs' lab.

73.     By way of a May 12, 2004 email, in relation to Dr. Mhaka's inventive contributions (which culminated in her conception of AMM9), Dr. Denmeade claimed that "all of the current work is really covered in the pending PSMA patent."  It was not.

74.     Dr. Denmeade, as stated in his May 12, 2004 email, spoke to Dr. Craig Dionne in relation to Dr. Mhaka's inventive contributions and patenting.  Dr. Dionne was then, is now, and has been for all relevant times at issue here, GenSpera's C.E.O.  GenSpera was involved in conveying the statement to Dr. Mhaka that "all the current work is really covered" by Defendants preexisting patent applications through its agents: Drs. Denmeade and Dionne.

75.     Dr. Mhaka reasonably relied on this representation, and her confidence in Drs. Isaacs and Denmeade, in not pursuing the matter further, *e.g.*, filing a formal complaint with Johns Hopkins University's conflicts committee; raising a formal grievance with her Division; raising a formal grievance with the Office of the Provost; or demanding that a new patent application with her named as a co-inventor be filed on inventions which included her significant and material inventive contributions.

76.     Both Drs. Isaacs and Denmeade served as referees for Dr. Mhaka's dissertation.  In recommending acceptance of Dr. Mhaka's dissertation in partial fulfillment of Dr. Mhaka's Ph.D. requirements (by letter dated September 1, 2004), Dr. Denmeade stated that "[then] Ms. Mhaka **defined** a series of peptide substrates that were specifically hydrolyzed by PSMA;" "[that s]he **discovered** that the prodrugs that were efficiently hydrolyzed by PS[M]A[6] were also selectively toxic to PSMA-producing cell lines;" and that on the basis of her results "[then] Ms. Mhaka selected two lead prodrugs . . ." (emphasis added).  Dr. Denmeade went on to characterize Dr. Mhaka's PSMA work as "original,"

---

[6] This sentence makes reference to PSA.  PSA is a different potential prodrug target worked on in Drs. Isaacs and Denmeade's laboratories.  While Dr. Mhaka did some work on this target early on, her thesis work was completely devoted to PSMA.  The reference to PSA is a typographical error, and the reference is in fact to PSMA.

and as representing a "significant contribution to knowledge and treatment of prostate cancer." Dr. Isaacs, in his letter recommending acceptance of Dr. Mhaka's dissertation, also described Dr. Mhaka's work as "original," and as representing "a significant contribution to knowledge and treatment of prostate cancer."

**H.     Prior to Litigation, Drs. Isaacs and Denmeade Were Quick to Recognize Dr. Mhaka's Contribution**

77.     GenSpera's recent litigation position that Dr. Mhaka did not make an inventive contribution to the Patents is squarely contradicted by the historical record.  Time and again, GenSpera, through its agent's and consultants, Drs. Isaacs and Denmeade, recognized Dr. Mhaka's significant contribution, including without limitation, the following:

- "I have spent a lot of time living with your thesis to write the first half of the paper related to the in vitro work.  I am not sure you would even remember much of it at this point, but you did a great job." Denmeade to Mhaka, June 30, 2011.

- "While your contribution at the beginning was significant, and we might have been able to publish part of the story at that time, we have moved on...." Denmeade to Mhaka, November 9, 2011.

78.     Other professors at Johns Hopkins Medical School who were personally involved in the process and personally witnessed Dr. Mhaka's contributions had confirmed that Dr. Mhaka made an inventive contribution and she should have been listed as a co-inventor.

79.     GenSpera decided not to credit Dr. Mhaka as a co-inventor, in point, because it feared that giving her proper credit might create licensing issues for GenSpera.

**I.     GenSpera Denies Plaintiff Any Remedy Under the Patent Act**

80.     The provisional in question was filed in late 2000 (Provisional Application No. 60/250,543).

81.     The application that issued as the '354 Patent (Application No. 10/432,849) was filed in 2003 as the national leg of an international patent application (PCT/US01/45100) which was filed in November 2001.  The international application claimed the benefit of the earlier filed provisional application.  The '354 Patent issued without Dr. Mhaka listed as a joint inventor.

82.     The application which issued as the '648 Patent (Application No. 12/323,380) was a divisional of the application that issued as the '354 Patent; the '648 Patent also issued without Dr. Mhaka listed as a joint inventor.

83.     The claim which ultimately issued as Claim 1 of the '354 Patent first appeared in the prosecution in a preliminary amendment and response to a restriction requirement dated November 3, 2006.  This same response contained the statement: "*No new matter has been added*" (emphasis in the original)—but, new matter, in the form of Dr. Mhaka's inventive contributions, had indeed been added. The application which issued as the '648 Patent was not filed until November 2008.  However, both the '354 Patent and the '648 Patent claim priority back to the international application (which shares a virtually identical specification with the Patents), and thus ultimately claim the benefit of the 2000 provisional application.

84.     The disclosures contained in the Patents' specifications pre-date Dr. Mhaka's inventive contributions—these contributions occurred in 2002-2003—and pre-date the first appearance of the pivotal claim, '354, Claim 1.  Having misappropriated Dr. Mhaka's 2002-2003 contributions (most critically AMM9, which she conceived) and slipped them into GenSpera's patent applications, which claim the benefit of the earlier 2001 international application and the 2000 provisional application, the Defendants have intentionally deprived Dr. Mhaka of any rights in her inventions.

85.     This results from the fact that the Patent Act (35 U.S.C. §§ 1-376) does not afford Dr.

Mhaka a remedy owing to the timing of Defendants' various acts.  35 U.S.C. § 256 provides for the

correction of a patent in the case of non-joinder (an omitted inventor; this case) or mis-joinder (a wrong

inventor).  However, 35 U.S.C. § 256 has been read solely as a saving provision, *i.e.*, it is to be used in

the event that a non- or mis-joinder event may invalidate a patent.  As such, 35 U.S.C. § 256 cannot be

used to correct the inventorship of a patent where to do so would necessitate the patent's invalidity.  This

is the case here.

86.     Adding Dr. Mhaka to the Patents would necessitate their invalidity because they would

necessarily run afoul of 35 U.S.C. § 112.  Per 35 U.S.C. § 112 a patent must be enabled by its

specification (the specification must disclose how to practice the invention) and a patent's specification

must provide a written description of the invention (the disclosures must demonstrate that the named

inventors were actually in possession of the invention).  Since the Patents' specifications originate with

the 2001 international application, but Dr. Mhaka's inventions (which culminate in the composition of

matter first added to the prosecution history in 2006) were conceived in 2002-2003, it is impossible that

claims encompassing Dr. Mhaka's inventions (the actual rights conveyed by the Patents) are supported

by the Patents' specifications' disclosures.  That is, to add Dr. Mhaka to the Patents is to acknowledge

(correctly) that some portion of the claimed subject matter was invented in 2002-2003, and thus could

not be taught or possessed in 2001.  This result violates the requirements of 35 U.S.C. § 112, and thus

deprives Dr. Mhaka of recourse under 35 U.S.C. § 256.  As far as the Patent Act is concerned

Defendants have executed the perfect wrong.

87.     GenSpera has admitted the failings of the Patent Act to provide Dr. Mhaka relief.  On

March 12, 2012 GenSpera filed a declaratory action against Dr. Mhaka in the U.S. District Court for the

District of Maryland.  Dr. Mhaka counter-claimed seeking to be added as a named inventor on the

Patents pursuant to 35 U.S.C. § 256.  In seeking leave to file a summary judgment motion on the

inability of the District Court to grant Dr. Mhaka relief under 35 U.S.C. § 256, GenSpera admitted that

the international application for the patents at issue was filed on November 30, 2001, and for the limited

purposes of GenSpera's summary judgment motion, that "Dr. Mhaka, after 2001, contributed to the

patents in a significant, material, inventive way in connection with the compound G-202, also referred to

as AMM9, included in claim 1 of both patents that were issued."  In so doing the Defendants closed the

loop on their wrongs against Dr. Mhaka and have perfected her state based claims for relief set forth

below.

88.     Dr. Mhaka did not participate in her omission from the '354 and '648 Patents, and did not

harbor any deceptive or bad faith intent with regards to her omissions from the same.

89.     Dr. Mhaka is a joint inventor of the inventions claimed in both the '354 and '648 patents.

**J.      The Patent Claims Are Not Supported by Their Specifications**

90.     Claim 1 of the '354 Patent covers seven compounds, only two of which (AMM4 and

AMM9) have ever been synthesized, and only one of which (AMM9) works.  No compound covered by

Claim 1 of the '354 Patent is specifically disclosed in the Patents' specifications; the same is true of the

2000 provisional.

91.     Non-specific descriptions of peptide sequences cleavable by PSMA do not support the

claims of the Patents.  The specifications' non-specific disclosures amount to possible amino acid

combinations that literally amount to trillions on trillions of sequences.  This does not demonstrate

possession of an infinitely narrower genus of seven species.  And, it certainly does not amount to a

description of how to arrive at the claimed genus, or one of its members, without undue experimentation.

92.     The so-called preferred embodiments of the invention described in the Patents' specifications, certain pentapetides with Asp-Glu C-terminal alpha di-peptide caps, are not covered by the Patents' claims. These preferred embodiments are based on a hypothesis which was disproved by Dr. Mhaka after the filing of the specifications, and these same preferred embodiments teach away from the ultimately claimed invention—an ultimate claim based on Dr. Mhaka's 2002-2003 work. In teaching away from the claimed invention the disclosures necessitate undue experimentation to arrive at a member of the claimed genus, and the genus itself.

93.     Conception of the inventions claimed in the Patents was not complete until 2002-2003 when Dr. Mhaka made her contributions, contributions that culminated in her conception of AMM9. The Patents' claims are unsupported by their pre-2002 disclosures.

94.     Reduction-to-practice of the inventions claimed in the Patents was not complete until 2002-2003 when Dr. Mhaka made her contributions, contributions that culminated in her reduction-to-practice of AMM9.

95.     Dr. Mhaka's inventive contributions, and in particular AMM9, are novel and nonobvious over the disclosures in the international application and the provisional application.

**K.     The Patents are Licensed to GenSpera**

96.     Johns Hopkins University and/or one of its affiliates held certain rights in the inventions claimed in the '354 and '648 Patents.

97.     The Johns Hopkins University Intellectual Property Policy in place during the relevant period generally envisions a distribution of a portion of the revenues from intellectual property to inventors.

98.     In or around 2004 Johns Hopkins University assigned the claimed inventions to the named inventors: Drs. Isaacs and Denmeade.

99.     Shortly thereafter, and before Dr. Denmeade's May 2004 email to Dr. Mhaka claiming that her contributions were covered by Drs. Isaacs and Denmeade's preexisting applications, Drs. Isaacs and Denmeade entered into a binding letter of intent with GenSpera to exclusively license the claimed inventions to GenSpera.  GenSpera had been formed the year prior.  GenSpera has since entered into an exclusive license to the Patents.

100.    Drs. Isaacs and Denmeade hold stock in GenSpera with both serving on GenSpera's Scientific Advisory Board.  Dr. Isaacs serves as GenSpera's Chief Scientific Advisor, while Dr. Denmeade serves as GenSpera's Chief Medical Advisor.  Drs. Isaacs and Denmeade are agents of GenSpera, and were acting within the scope of that agency in executing acts that lead to the deprivation of Dr. Mhaka's rights in her inventions.

101.    Drs. Isaacs and Denmeade's stock holdings in GenSpera are substantially attributable to the inventions covered by the Patents and their exclusive licensing of the Patents to GenSpera.

102.    GenSpera, through both Drs. Isaacs and Denmeade, and its officers, has been intimately involved in the prosecution of the patent applications at issue here from at least 2004.  GenSpera's patent prosecution attorneys were actively consulting with Drs. Isaacs and Denmeade from at least when Johns Hopkins University assigned its rights in the claimed inventions to Drs. Isaacs and Denmeade.

103.   GenSpera currently has a drug candidate in clinical trials the use of which is covered by the rights it received from Drs. Isaacs and Denmeade.  G-202, GenSpera's lead drug candidate, is the compound covered by the relevant rights; this lead candidate is AMM9.

104.   Had Dr. Mhaka's inventive contributions not been lifted and slipped into patent applications that rest on preexisting applications a new application in which Dr. Mhaka was properly named as a joint inventor of the subject matter claimed by the Patents could have been filed.  At the least Dr. Mhaka would have had a financial interest in this application and any resulting patents.  The Defendants actions have deprived Dr. Mhaka of the rights she otherwise would have had in her inventions, resulting in damage to her.

### FIRST CLAIM FOR RELIEF:
### (Conversion Against All Defendants)

105.   Dr. Mhaka incorporates and realleges, as though fully set forth herein, the allegations contained in paragraphs 1 through 104 above.

106.   Defendants through their incorporation of Dr. Mhaka's 2002-2003 inventive contributions (as described above, and including but not limited to the conception of AMM9) into the claimed subject matter of the Patents have permanently deprived Dr. Mhaka of her rights and/or interest in her inventions.

107.   Defendants (through their own actions and those of Dionne) intended to assert a right inconsistent with Dr. Mhaka's right of control and/or interest in her inventions in securing all the patent rights to her inventions for themselves.

108.   The Defendants conducted themselves in bad faith.

109.   Owing to Defendants wrongful conduct Dr. Mhaka's rights and/or interest in her inventions have been lost.

110.   Dr. Mhaka has suffered expense and inconvenience owing to the deprivation of her rights and/or interest in her inventions caused by Defendants' wrongful conduct.

111.   As a foreseeable result of Defendants' wrongful conduct described above, Dr. Mhaka has suffered damages in an amount to be ascertained at trial.

112.   Defendants' wrongful conduct described above was done with actual malice.

## SECOND CLAIM FOR RELIEF:
### (Constructive Fraud Against All Defendants)

113.   Dr. Mhaka incorporates and realleges, as though fully set forth herein, the allegations contained in paragraphs 1 through 104 above.

114.   By virtue of Dr. Isaacs' and Dr. Denmeade's positions as advisors to Dr. Mhaka, Drs. Isaacs and Denmeade owed Dr. Mhaka a duty of confidence and/or fiduciary duty.  Dr. Mhaka reposed trust and confidence in Drs. Isaacs and Denmeade, who had control and influence over intellectual property developed in their laboratories.

115.   Drs. Isaacs and Denmeade are agents of GenSpera and were acting within the scope of that agency in executing acts concerning the intellectual property developed in Dr. Isaacs' and Dr. Denmeade's laboratories that is covered by the Patents.  As such, GenSpera owed Dr. Mhaka a duty of confidence and/or fiduciary duty with respect to the control and influence it exerted over intellectual property developed in Dr. Isaacs' and Dr. Denmeade's laboratories.

116.   Defendants have breached the duties they owed Dr. Mhaka through causing and/or allowing the incorporation of inventions and/or intellectual property developed by her while a graduate student in Dr. Isaacs' and Dr. Denmeade's laboratories into the Patents.

117.    Defendants incorporation of the subject matter claimed by issued Claim 1 of the '354 Patent and issued Claim 1 of the '648 Patent into the respective patent applications violated confidences they owed Dr. Mhaka.

118.    Defendants' above described violations of confidences owed Dr. Mhaka deceived the U.S. Patent and Trademark Office, and resulted in injury to the public interest.

119.    Defendants' breaches have caused injury and damage to Dr. Mhaka in an amount to be ascertained at trial.

120.    Defendants' violations and deceptions described above were done with actual malice.

## THIRD CLAIM FOR RELIEF:
### (Unjust Enrichment Against All Defendants)

121.    Dr. Mhaka incorporates and realleges, as though fully set forth herein, the allegations contained in paragraphs 1 through 104 above.

122.    Dr. Mhaka has conferred upon the Defendants a benefit in the form of the subject matter covered by the Patents that represent her inventive contributions.

123.    Defendants were aware of, and had knowledge of, the benefits conferred upon their patent applications and ultimately the Patents by incorporation of inventions and/or intellectual property developed by Dr. Mhaka while a graduate student in Dr. Isaacs' and Dr. Denmeade's laboratories into said applications and patents.

124.    Defendants' acceptance and retention of inventions and/or intellectual property developed by Dr. Mhaka over the course of the prosecution of patent applications which claimed the benefit of disclosures that pre-dated the development of the inventions and/or intellectual property in question, while having knowledge that the inventive contributions in question were made by Dr. Mhaka after the

disclosures in question were filed, make it inequitable for Defendants to retain these benefits without payment of their value—their value to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Dr. Mhaka prays for judgment against defendants and each of them as follows:

A.   For damages in an amount to be proven at trial;

B.   For prejudgment interest at the rate allowed by law;

C.   For punitive and exemplary damages;

D.   For restitution and disgorgement of unjust enrichment;

E.   For a charge upon Defendants of a constructive trust of one-half of each Dr. Isaacs' and Dr. Denmeade's stock holdings in GenSpera, and for any and other benefit the Defendants received, for the benefit of Dr. Mhaka, and an order to the Defendants as constructive trustees to convey all right, title and interests in one-half each of Dr. Isaacs' and Dr. Denmeade's stock holdings in GenSpera, and to convey any and other benefit the Defendants received, to Dr. Mhaka free of any and all encumbrances;

F.   For costs of suit including attorney's fees incurred; and

G.   For such other and further relief as the Court may deem just and proper.

Dated: May 13, 2013

                                        /s/
                                   _____
                                   Philip M. Andrews (Federal Bar No. 00078)
                                   Ezra S. Gollogly (Federal Bar No. 28088)
                                   Katrina J. Dennis (Federal Bar No. 27893)
                                   Kramon & Graham, P.A.
                                   One South Street
                                   Suite 2600
                                   Baltimore, Maryland 21202
                                   pandrews@kg-law.com
                                   egollogly@kg-law.com
                                   kdennis@kg-law.com
                                   Phone: (410) 752-6030

Fax:  (410) 539-1269

Spencer Hosie (admitted *pro hac vice*)
Diane S. Rice (admitted *pro hac vice*)
Darrell Rae Atkinson (admitted *pro hac vice*)
Hosie Rice LLP
Transamerica Pyramid, 34th Floor
600 Montgomery Street
San Francisco, CA 94111
shosie@hosielaw.com
drice@hosielaw.com
datkinson@hosielaw.com
Phone:  (415) 247-6000
Fax (415) 247-6001

*Attorneys for Defendant and Counter-Plaintiff*
*Annastasiah Mudiwa Mhaka*

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b), Fed.R.Civ.P., Dr. Mhaka demands a trial by jury of all issues so triable.

Dated:  May 13, 2013

_____/s/_____
Philip M. Andrews (Federal Bar No. 00078)
Ezra S. Gollogly (Federal Bar No. 28088)
Katrina J. Dennis (Federal Bar No. 27893)
Kramon & Graham, P.A.
One South Street
Suite 2600
Baltimore, Maryland 21202
pandrews@kg-law.com
egollogly@kg-law.com
kdennis@kg-law.com
Phone:  (410) 752-6030
Fax:  (410) 539-1269

Spencer Hosie (admitted *pro hac vice*)
Diane S. Rice (admitted *pro hac vice*)
Darrell Rae Atkinson (admitted *pro hac vice*)
Hosie Rice LLP
Transamerica Pyramid, 34th Floor
600 Montgomery Street
San Francisco, CA 94111

shosie@hosielaw.com
drice@hosielaw.com
datkinson@hosielaw.com
Phone:  (415) 247-6000
Fax (415) 247-6001

*Attorneys for Defendant and Counter-
Plaintiff Annastasiah Mudiwa Mhaka*

12176/0/01347766.DOCXv1