UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| GENSPERA, INC.,<br>Plaintiff, Counter-Claim Defendant | * | |
| | * | |
| v. | | Civil Action No. MJG-12-772 |
| | * | |
| DR. JOHN ISAACS and DR. SAM<br>DENMEADE, | * | |
| Counter-Claim Defendants | * | |
| | * | |
| v. | | |
| | * | |
| ANNASTASIAH MUDIWA MHAKA, | * | |
| Defendant, Counter-Claim Plaintiff | * | |
| | | |
| *  *  *  *  *  *  *  *  *  *  *  * | * | *  *  *  *  *  *  *  *  *  *  *  * |
| ANNASTASIAH MUDIWA MHAKA,<br>Plaintiff | * | |
| v. | * | Civil Action No. MJG-12-3302 |
| GENSPERA, INC., DR. JOHN ISAACS and<br>DR. SAM DENMEADE,<br>Defendants | * | **REDACTED** |
| | * | |
| | * | |
| | * | |
| | * | |

**************************************************************************

## DEFENDANT AND COUNTER-CLAIM PLAINTIFF'S OPPOSITION TO COUNTER-CLAIM DEFENDANTS DENMEADE'S AND ISAACS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

                                                                                                          **Page**

I.      INTRODUCTION AND SUMMARY                                                                              1

II.     PROCEDURAL CHRONOLOGY                                                                                 5

III.    FACTUAL HISTORY                                                                                       7

        A.      The Basic Inventorship Dispute Leading Up to the Wrongdoing                                   7

        B.      What Counter-Claim Defendants Concealed                                                       9

IV.     THE LAW                                                                                              12

        A.      Summary Judgment and the Statute of Limitations                                             12

        B.      Statute of Limitations and "Accrual"                                                        14

        C.      Dr. Mhaka's State Tort Claims                                                                15

        D.      The "Discovery Rule"                                                                         17

        E.      Equitable Tolling: Equitable Estoppel                                                        18

V.      ARGUMENT                                                                                            20

        A.      Mhaka's Claim for Conversion is Not Time-Barred Did Not Accrue Before
                the Limitations Period                                                                       20

        B.      Mhaka's Claim for Constructive Fraud Did Not Accrue Before the Limitations
                Period                                                                                       23

        C.      Mhaka's Claim for Unjust Enrichment Did Not Accrue Before the Limitations
                Period                                                                                       27

        D.      The Claims Are Not Barred Pursuant to the Discovery Rules; There Was No
                Actual Notice in 2008 and No Fair Constructive Notice                                        28

        E.      Limitations Were Tolled by Counter-Claim Defendants' Affirmative
                Misrepresentations (and Concealment) Pursuant to Equitable Tolling and
                Equitable Estoppel                                                                           31

VI.     CONCLUSION                                                                                          32

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page**

*AAA Antiques Mall, Inc. v. Visa U.S.A. Inc., et al.*
    558 F. Supp. 2d 607 (D. Minn. 2008)                                   14-15

*Advanced Cardiovascular Systems, Inc. v. Scimed Life Systems, Inc.,*
    988 F.2d 1157 (Fed. Cir. 1993)                                        29

*Ahmad v. Eastpines Terrace Apartments, Inc.,*
    28 A.3d 1 (Md. Ct. Spec. App. 2011)                                  15-16, 28

*Ashton v. Brown,*
    660 A.2d 447 (Md. 1995)                                               13

*Atlantis Information Tech. v. CA, Inc.,*
    485 F. Supp. 2d 224 (E.D.N.Y. 2007)                                  24

*Bank of America Corporation v. Gibbons,*
    918 A.2d 565 (Md. Ct. Spec. App. 2007)                               12, 27

*Bank of N.Y. v. Sheff,*
    854 A.2d 1269 (Md. 2004)                                              17

*Barry & Gould, P.A. v. Berry,*
    757 A.2d 108 (Md. 2000)                                               16

*Bayshore Industries v. Ziats,*
    192 A.2d 487 (Md. 1963)                                               18

*Beneficial Standard Life Ins. v. Madariaga,*
    851 F.2d 271 (9th Cir. 1988)                                          23

*Benson v. State,*
    887 A.2d 525 (Md. 2005)                                               27

*Brass Metal Prods. v. E-J Enters., Inc.,*
    984 A.2d 361 (Md. Ct. Spec. App. 2009)                               2

*Canaj, Inc. v. Baker & Div. Phase III,*
    891 A.2d 1067 (Md. 2006)                                              16

*Chesapeake Bay Foundation v. Weyerhaeuser Co.,*
    849 F. Supp. 2d 570 (2002)                                            17-18

*Cooper v. Berkshire Life Insurance Co.*,
    810 A.2d 1045 (Md. Ct. Spec. App. 2002)        13

*County Comm'rs v. J. Roland Dashiell & Sons, Inc.*,
    747 A.2d 600  (Md. 2000)        16

*Darcars Motors v. Boryzm*,
    841 A.2d 828 (Md. 2004)        15, 21

*Doe v. Archdiocese of Wash.*,
    689 A.2d 634 (Md. Ct. Spec. App. 1997)        17

*Doe v. Maskell*,
    679 A.2d 1087 (Md. 1996)        18

*Duke Street Ltd. P'ship v. Bd. of Cty. Comm'rs*,
    112 Md.App. 37, 684 A.2d 40 (1996)        14

*Edwards v. Demedis*,
    118 Md.App. 541, 703 A.2d 240 (1997)        14

*Edwards v. Gramling Eng'g. Corp.*,
    588 A.2d 793 (Md. 1991)        21-23, 26, 28

*Ellerin v. Fairfax Sav.*,
    652 A.2d 1117 (Md. 1995)        16

*English v. Pabst Brewing Co.*,
    828 F.2d 1047 (4th Cir. 1987)        19

*Equipment Finance, LLC v. Hutchinson*,
    No. 09-cv-01964 (E.D. Pa. Sep. 24, 2010)        1, 5

*Fairfax Sav., F.S.B. v. Weinberg & Green*,
    685 A.2d 1189 (Md. Ct. Spec. App. 1996)        16

*Finch v. Hughes Aircraft Co.*,
    469 A.2d 867 (Md. Ct. Spec. App. 1984)        25

*Frederick Rd. Ltd. P'ship v. Brown & Sturm*,
    756 A.2d 963 (Md. 2000)        13, 19

*General Bedding Corporation v. Echevarria*,
    947 F.2d 1395 (9th Cir. 1991)        29

*General Electric Co. v. Wabash Appliance Corp.,*
    304 U.S. 364 (1938)      21

*Guardian Life Ins. v. Handel,*
    190 A.D. 2d 57 (N.Y. App. Div. 1993)      24

*Harig v. Johns-Manville Prods.,*
    394 A.2d 299 (Md. 1978)      18

*Harker v. Dement,*
    9 Gill 7 (1850)      20

*Hecht v. Resolution Trust Corp.,*
    635 A.2d 394 (1994)      17

*Hill v. Cross-Country Settlements, LLC,*
    936 A.2d 343 (Md. 2007)      16, 20

*Interstate Ins. Co. v. Logan,*
    109 A.2d 904 (Md. 1954)      15

*Jackson v. 2109 Brandywine, LLC,*
    952 A.2d 304 (Md. Ct. Spec. App. 2008)      27

*James v. Weisheit,*
    367 A.2d 482 (Md. 1977)      12

*Jones v. Mid-Atl. Funding Co.,*
    766 A.2d 617 (Md. 2001)      13

*Kalb v. Vega,*
    468 A.2d 676 (Md. Ct. Spec. App. 1983)      20

*Kirby v. Porter,*
    125 A. 41 (Md. 1923)      20

*Kirkpatrick v. Lenoir County Board of Edu.,*
    216 F.3d 380 (4th Cir. 2000)      5

*Lasater v. Guttmann,*
    5 A.3d 79 (Md. Ct. Spec. App. 2010)      15

*Lawrence v. Graham,*
    349 A.2d 271 (Md. 1975)      21

*Litz v. Maryland Dep't of Environment,*
    76 A.3d 1076 (Md. 2013)                                                              14

*Llanten v. Cedar Ridge Counseling Ctrs., LLC,*
    75 A.3d 1030 (Md. Ct. Spec. App. 2013)                                              15

*Lumsden v. Design Tech Builders,*
    749 A.2d 796 (Md. 2000)                                                             17

*MacBride v. Pishvaian,*
    A.2d 233 (2007)                                                                     14

*Md. Envtl. Trust v. Gaynor,*
    803 A.2d 512 (Md. 2002)                                                             16

*Midler v. Shapiro,*
    364 A.2d 99 (Md. Ct. Spec. App. 1976)                                              25

*Moreland v. Aetna U.S. Healthcare, Inc.,*
    831 A.2d 1091 (Md. Ct. Spec. App. 2013)                                            16

*Murphy v. Merzbacher,*
    697 A.2d 861 (Md. 1977)                                                            18

*Newell v. Richards, et al.,*
    594 A.2d 1152 (Md. 1990)                                                        1, 13

*Pennwalt Corp. v. Nasios,*
    550 A.2d 1155 (Md. 1988)                                                        13, 18

*Pitt v. Greenberg,*
    219 A.2d 237 (Md. 1966)                                                            27

*Poffenberger v. Risser,*
    431 A.2d 677 (Md. 1981)                                                        12, 17

*Prelich v. Medical Resources, Inc.,*
    813 F. Supp. 2d 654 (D.Md. 2011)                                                18-19

*Roberta L. Marcus, Inc. v. New Cingular Wireless,*
    No. 12-20744 2013 WL5554142, at *7 (S.D. Fla. Sept. 3, 2013)                        15

*Sadler v. Dimensions Healthcare Corp.,*
    836 A.2d 655 (Md. 2003)                                                            12

*Sanders v. Sanders,*
    274 A.2d 383 (Md. 1971)                                                    25

*Saunders v. Mullinix,*
    72 A.2d 720 (Md. 1950)                                                  2, 20-21

*Sears, Roebuck & Co. v. Stiffel Co.,*
    376 U.S. 225 (1964)                                                         2

*Shailendra-Kumar, P.A. v. Dhanda,*
    43 A.3d 1029 (Md. 2012)                                                    14

*St. John's University v. Bolton,*
    757 F. Supp. 2d 144 (E.D.N.Y. 2010)                                       1, 21

*St. Paul Travelers v. Millstone,*
    987 A.2d 116 (Md. 2010)                                                    14

*Steuart v. Carr,*
    6 Gill 430 (1848)                                                          18

*The Redemptorists v. Coulthard Servs., Inc.,*
    801 A. 2d 1104 (Md. 2002)                                                  15

*Trimper v. Porter-Hayden,*
    501 A.2d 446 (Md. 1985)                                                    14

*Whitney Holdings, Ltd. v. Givotovsky,*
    988 F.Supp. 732 (S.D.N.Y. 1997)                                            24

**Statutes**

35 U.S.C. § 256                                                              5, 23

**Miscellaneous**

American Jurisprudence 2d Limitations of Actions § 174 (2007)                 18
Courts & Judicial Proceeding Article § 5-203                                  19
Md. Code Ann., Cts & Jud. Proc. § 5-101                                     12, 16
Restatement of Restitution § 1 Cmt. a                                        27

## I.   **INTRODUCTION AND SUMMARY.**

*Men 'should not reap where they have not sown.'*

This Court granted Dr. Mhaka leave to file state tort claims of conversion, constructive

fraud, and unjust enrichment against Counter-Claim Defendants GenSpera, Inc., Dr. Isaacs and

Dr. Denmeade for misappropriating Dr. Mhaka's intellectual property. *See* Memorandum and

Order Re: Procedural Matters, April 30, 2013 (Dkt. No. 59, MJG-12-772). Counter-Claim

Defendants now argue that the three-year statute of limitations bars all state tort claims.

Counter-Claim Defendants state, as a given, that each of the tort claims accrued in November of

2006, when Counter-Claim Defendants amended a pending patent application. Without

evidence, proof, or even real analysis, Counter-Claim Defendants conclude that these state

claims are time barred.

They are not. There are no fewer than four things wrong with Counter-Claim

Defendants' argument, as follows:

*Counter-Claim Defendants Assume Their Conclusion But Prove Nothing.*

The statute of limitations is an affirmative defense, on which Counter-Claim Defendants

carry the burden of proof. *See Newell v. Richards, et al.,* 594 A.2d. 1152, 1156 (Md. 1990). To

prevail on summary judgment on this issue, Counter-Claim Defendants "must show that [they

have] provided evidence to support the findings of fact necessary to win." *See Equipment

Finance, LLC v. Hutchison,* No. 09-cv-01964 (E.D. PA. Sep. 24, 2010). Counter-Claim

Defendants must **prove** that "a reasonable juror would be compelled to find" in their favor. *Id.*

*See also, St. John's University v. Bolton,* 757 F. Supp. 2d 144, 157 (E.D.N.Y. 2010).

Counter-Claim Defendants have not remotely met their burden here. They cite no

evidence, instead relying on the argument of counsel (which is not evidence) on a different

1

subject (not accrual). They do not, for that matter, even discuss the elements of the state court claims and prove that all elements were present as of their preferred accrual date, November 2006. Had any of Counter-Claim Defendants converted Dr. Mhaka's property by 2006? (No). Had Dr. Mhaka then suffered injury? (No). Absent Counter-Claim Defendants doing their work and meeting their burden, we are left to guess at Counter-Claim Defendants' arguments. And guessing is not the province of a summary judgment.

### The State Claims Did Not Accrue Until Long After November 2006.

There is, perhaps, a reason why Counter-Claim Defendants decline to delve into the real issues: On these facts, Counter-Claim Defendants are wrong.

State law governing conversion requires "the wrongful deprivation of a person of property to the possession of which he is entitled." *Saunders v. Mullinix*, 72 A.2d 720, 722 (Md. 1950). Dr. Mhaka was not dispossessed of her property simply when Drs. Isaacs and Denmeade filed their AMM9 amendment in late 2006; that amendment gave them no rights whatsoever.[1] They had no monopoly then, no legal right to exclude.

Drs. Isaacs and Denmeade arguably earned the right to exclude when the first patent issued in December 2008. But was Dr. Mhaka then damaged? Not if she could reclaim her property by correcting inventorship; had she been added as an inventor, she would have enjoyed the economic benefits of her work. In a very real sense, Dr. Mhaka was not deprived of her property, legally and practically, until 2012, when Counter-Claim Defendants denied her

---

[1]     In the absence of a patent, "an inventor has no common-law right to a monopoly of his invention." *See Brass Metal Prods. v. E-J Enters., Inc.*, 984 A.2d 361, 379 (Md. Ct. Spec. App. 2009). When a product is unpatented and uncopyrighted, a state may not "prohibit the copying of the article itself or award damages for such copying." *Id., citing Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 232-33 (1964).

inventorship, as a matter of law. This event made her property theirs, the essence of conversion. The law accords. *See* below § V.A.

We do not know what Counter-Claim Defendants think on this point, as it is not even discussed much less briefed in their papers.

Finally, a cause of action in Maryland accrues only when **all** elements are present, including damages. Dr. Mhaka did not suffer compensable injury in 2006 - had she sued then, Counter-Claim Defendants' 12(b)(6) Motion would have been granted. Nor was she damaged in December 2008. GenSpera itself alleges that Drs. Isaacs and Denmeade did not exclusively license its IP to GenSpera until 2011, and Dr. Mhaka lost her rights as a co-inventor in 2012. This is the true date of injury for limitations accrual. For that matter, the second patent did not even issue until 2010. Counter-Claim Defendants could not convert a patent not yet issued.

*Dr. Mhaka Lacked Actual Notice of the Patent Issuance and Was Not – Fairly - on Constructive Notice.*

On this record, Counter-Claim Defendants cannot controvert that Dr. Mhaka lacked actual notice of the patent issuance well into the three year period. This, then, makes the question one of **constructive** notice: Are the facts here such that Dr. Mhaka should reasonably be deemed to be on constructive notice in December 2008, when the first patent issued?

Courts consider the question of constructive notice a mixed question of law and fact. They do so for a reason: It all depends. Was the Plaintiff's conduct reasonable? Did the Counter-Claim Defendants lull or mislead the Plaintiff, thereby making it harder to argue imputed notice? These are all nuanced and fact intensive questions. And, on the facts here, it is neither right nor just to say -- particularly as a matter of law -- that Dr. Mhaka should be deemed aware of the patent issuance the day it appeared on the Patent and Trademark Office site (and when exactly was that? Counter-Claim Defendants do not address this question, either).

3

*The Statute is Tolled By Counter-Claim Defendants' Affirmative Misrepresentations and Concealment.*

A statute of limitations may be tolled by Defendants' misrepresentations. Here, the record reflects that Counter-Claim Defendants affirmatively misled Dr. Mhaka for years, beginning in 2004. They told her that her research was bad and the results could not be reproduced (false). They told her that her work was not ready to be published (in 2004-2006). False, again. They told her that they did not see much value in AMM9, and were not sure it was even patentable. False, too.

Equally important is what Counter-Claim Defendants did **not** tell Dr. Mhaka, despite ongoing communications. They concealed that they had founded GenSpera in late 2003 to exploit her work. In fact, Counter-Claim Defendants did not tell Dr. Mhaka about GenSpera until 2011, and even then suggested to her that they had just recently founded the company.

They did not tell Dr. Mhaka that GenSpera filed an amendment to claim AMM9 specifically, the event they now say is pivotal to accrual. Instead, their communications were all calculated to downplay the significance of her work.

They did not tell Dr. Mhaka that Dr. Dionne's advice not to pursue a patent -- presented as advice from a disinterested third party -- was in fact advice from the CEO of the very company Isaacs and Denmeade had just founded to exploit AMM9.

And they did not tell Dr. Mhaka that they started to write an application in 2004 claiming AMM9 specifically, then dropped that effort and instead decided to slip AMM9 into their earlier 2001 application.

Given this history, it is not right to assume, as Counter-Claim Defendants do, that the statute has run as a matter of law. Tolling here presents a question of a fact. Again, Counter-

4

Claim Defendants simply assume their conclusion, and posit that the statute was not tolled, without even discussing the critical facts set forth above.[2]

Here, Counter-Claim Defendants have not set forth the legal elements of the state law claims, nor pointed to specific evidence which supports the accrual of each element in late 2006. *Equipment Finance, Id.* This motion should be denied.

## II.    PROCEDURAL CHRONOLOGY.

This is an interesting case with a unusual procedural arc.

On March 12, 2012, GenSpera sued Dr. Mhaka seeking to prove that Drs. Denmeade and Isaacs "were properly named as inventors" on the '354 and '648 Patents and that Dr. Mhaka should not be added as a co-inventor. *See* Compt. (Dkt. No. 1, ELH-12-772). GenSpera asserted that Dr. Mhaka "did not contribute in a significant, inventive and material way to the conception of [the patents-in-suit]," and "should not be added to the patents-in-suit as an additional inventor." *See Id.* at ¶¶ 36- 37 and 41- 42. To the contrary, GenSpera alleged that its two consultants, Drs. Samuel Denmeade and John Isaacs, were the only true inventors. Dr. Mhaka filed an Answer and a Counterclaim seeking to be added as an inventor of the patents by virtue of 35 U.S.C. § 256. *See* Answer (Dkt. No. 16, MGJ-12-772).

Discovery did not go well for GenSpera. The evidence established that Dr. Mhaka made a critical inventive contribution. Just as discovery closed, GenSpera changed its position and asked leave to file a summary judgment motion. *See* Dkt. No. 30, MJG-12-772. GenSpera then conceded, for the purposes of that motion, that Dr. Mhaka made an inventive contribution, but

---

[2]      More, the statute on a related counter-claim is tolled by the filing of the first complaint under federal law. *See Kirkpatrick v. Lenoir County Board of Edu.*, 216 F.3d 380, 388 (4th Cir. 2000) (counterclaim relates back). This Court previously held that the state law claims arise from the same transaction. *See* Order re Procedural Matters, (Dkt. No. 59, MJG-12-772). This makes the effective date of Dr. Mhaka's filing March 12, 2012, when GenSpera first filed suit. *See* below § V. Counter-Claim Defendants ignore this point, too.

could not be added as an inventor, as her post-application inventive contribution would invalidate the patents.

On October 24, 2012, this Court granted GenSpera leave to file a summary judgment motion with regard to its contention that the Court lacked the ability to provide Dr. Mhaka the relief requested.

On November 1, 2012, Dr. Mhaka filed a Complaint in the Circuit Court for Baltimore City, Maryland, presenting state-law tort claims of conversion, constructive fraud, and unjust enrichment against Counter-Claim Defendants. *See* Compl., (Dkt. No. 2, MJG-12-3302). The state Complaint differs in material ways relative to the prior federal complaint on inventorship. Most significantly, the state complaint makes clear that the state tort claims were only perfected once GenSpera established that Dr. Mhaka cannot be added as an inventor to the patents-in-suit by conceding her that very status: This is specifically plead in the state court complaint, an allegation GenSpera ignores. Had Dr. Mhaka been able to correct inventorship, there would have been, *e.g.* no conversion, as she would have her property back, no constructive fraud, as there would be no need for constructive trust, and no unjust enrichment, as she would have shared equally with the benefits bestowed on Counter-Claim Defendants.

On November 9, 2012, Counter-Claim Defendants removed the state case to federal court.

On November 16, 2012, Counter-Claim Defendants moved to dismiss Dr. Mhaka's state claims on procedural grounds that the claims (1) should have been brought as compulsory counterclaims in MJG-12-772; (2) should be dismissed under the claim splitting doctrine; and, (3) were preempted by federal patent law.

6

On April 30, 2013, the Court granted Dr. Mhaka leave to file her Amended Counterclaim

in MJG-12-772 against Counter-Claim Defendants. *See* Mem. & Order Re: Procedural Matters

(Dkt. No. 59, MJG-12-772).  Dr. Mhaka's Cross-Motion for Summary Judgment and

Defendants' Motion to Dismiss were denied.  *Id.* The Court determined that the claims

presented in the Complaint and Dr. Mhaka's counterclaim should proceed on a consolidated

basis and further discovery commenced under a new Scheduling Order. *See* Dkt. No. 68, MJG-

12-772.

### III.   FACTUAL HISTORY.

#### A.   The Basic Inventorship Dispute Leading Up to the Wrongdoing.

In late 2003, Dr. Mhaka conceived of and reduced to practice a novel new compound.

She called the compound AMM9, after her initials.  Her discovery followed years of research

and lab work, all directed to finding a new drug to combat prostate cancer.

Dr. Mhaka wrote up her findings and presented them to her thesis advisor and mentor,

Dr. Denmeade, in early 2004.  Dr. Denmeade reviewed the materials, and instructed Dr. Mhaka

to delete any and all information disclosing the structure and nature of the AMM9 compound.

("Q: And one of the structures you asked her to excise physically from the poster was AMM9?

A: Yes.").  Denmeade Dep. 82:23-25, Aug. 31, 2012, Ex. A to Gollogly Decl.  Dr. Mhaka did as

instructed.  Dr. Denmeade testified that he so insisted as he did not want any public disclosure of

the novel compound. *See id.* at 82:11-16 & 84:3-7.

At deposition, Dr. Denmeade also conceded that AMM9 was created in the latter half of

2003, but said that it was his idea, not Dr. Mhaka's:

> Q:   Well, who gave birth to AMM9?
> A:   I believe I gave birth to AMM9.
> Q:   When did you do that, sir?
> A:   My recollection, it was in the latter half of 2003 . . . .

7

*Id.* at 56:5-9.  Dr. Denmeade thus confirms the invention's date, but contends it was his invention, not Dr. Mhaka's.

In 2004, Dr. Mhaka pressed Dr. Denmeade for permission to publish her AMM9 research and findings; under JHU rules, she could not publish without Dr. Denmeade's consent.  *Cf.* Denmeade Depo. at 28:12-29:13.  Dr. Denmeade said no, and explained to Dr. Mhaka that it was "premature to publish the results based on the ongoing experiments." *Id.* at 29:16-17.  Re dac ted

*See* Denmeade to Mhaka, May 12, 2004, Ex. B to Gollogly Decl.  Dr. Denmeade did **not** tell Dr. Mhaka that Dionne was CEO of Denmeade's company, GenSpera, a company founded to exploit AMM9, nor that the group was even then working on an AMM9 application. Ex. A at 29: 16-18.

a death knell in scientific research.  *See* E-mail from Mhaka to Denmeade (Nov. 28, 2005), Ex. C to Gollogly Decl.

Dr. Mhaka continued to press for leave to publish through calendar year 2005, but to no avail.  Indeed, in November 2005, Dr. Denmeade e-mailed Dr. Mhaka saying that 

E-mail from Denmeade to Mhaka (Nov. 28, 2005)(emphasis added), Ex. C to Gollogly Decl.



*See* E-mail from Mhaka to

Denmeade (June 23, 2006), Ex. D to Gollogly Decl. ████ Redacted ████

████ Redacted ████

████  E-mail from

Denmeade to Mhaka (June 23, 2006), Ex. E to Gollogly Decl.  As Dr. Denmeade conceded at

deposition, this was not "completely true":

> Q:      Okay, so you wanted to publish.  You just didn't have time
> to finish writing it, true?
> A:      I don't know if that's completely true.  I stated that I was
> busy and hard to carve out the time, but I don't know if we were
> ready at that time to write a paper either.

Denmeade Depo. at 40:15-20, Ex. A.

Ultimately, the patents issued with AMM9 being the one point of patentable novelty.  It

was the only claim allowed.  '354 issued on December 23, 2008, and '648 issued on August 3,

2010.

### B.     What Counter-Claim Defendants Concealed.

Unbeknownst to Dr. Mhaka, Dr. Denmeade and his peer, Dr. John Isaacs, formed a

company to exploit AMM9 in late 2003.  They called the company GenSpera.  In early 2004,

they discussed internally and with counsel whether to file a new patent application on AMM9,

going so far as to write up a disclosure setting forth the AMM9 points of novelty and

inventiveness.  For reasons now shrouded in privilege,[3] GenSpera and Drs. Isaacs and Denmeade

did not go forward with this AMM9 application in 2004.  To the contrary, and even as they were

telling Dr. Mhaka that her work was not ready to be published, Drs. Denmeade and Isaacs filed

an AMM9 specific claim in a long-preexisting PSMA patent application.  They did so in the fall

---

[3]      GenSpera recalled all the documents explaining this as privileged; only the fact of the
considered application remains of record.

of 2006. *They did not disclose any of this to Dr. Mhaka, even though they were corresponding with her about her work and results and her desire to publish.*

Drs. Denmeade and Isaacs also hid the fact that in 2004, they entered into a Letter of Intent with GenSpera to exclusively license the claimed inventions to GenSpera. Both Drs. Denmeade and Isaacs received stock in GenSpera and served on GenSpera's Scientific Advisory Board; Denmeade as GenSpera's Chief Medical Advisor; Isaacs as GenSpera's Chief Scientific Advisor.[4] It was not until April, 2011 that GenSpera entered into an exclusive license to the patents-in-suit. *See* GenSpera Complaint at ¶ 20 (Dkt. No. 1, ELH-12-772). This was concealed from Dr. Mhaka until later in 2011.

Dr. Denmeade finally disclosed the presence of some but not all of GenSpera's covert activities to Dr. Mhaka in June 2011. Still e-mailing Dr. Mhaka in his role as a faculty member at Johns Hopkins University School of Medicine, he finally told Dr. Mhaka that he and Dr. Isaacs formed GenSpera. But he still concealed their issued stock options, Board titles, and their exclusive license to GenSpera. Dr. Mhaka did not then and does not now have access to any of these records.

Dr. Denmeade's email is an exercise in misdirection:

> Your email was spookily timely, since **I have spent the last month finally writing up the PSMA-activated prodrug paper.** Since you left so many years ago so much has happened with this approach. We have tested one of the prodrugs, now called G202 in numerous ways in animal studies. **Based on the results John and I and Craig Dionne formed a company called GenSpera.** Craig is the CEO and does all the work and John and I watch from the

---

[4]     Counter-claim Defendants' Interrogatory Responses state that ▓▓▓▓ Redacted ▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *ee*
Isaacs' Responses to Mhaka's First Set of Interrogatories at No. 7 & 18, Ex. H to Gollogly Decl.; Denmeade's Responses to Mhaka's First Set of Interrogatories at No. 7 & 17, Ex. M to Gollogly Decl. Hardly.

10

> sidelines. Craig has managed to raise sufficient money to allow us
> to finish GMP manufacture, animal toxicology studies and start
> human clinical trials with the lead prodrug.  We have now treated
> about 18 patients and are expecting to follow-up with some Phase
> II studies in select cancers.

E-mail from Denmeade to Mhaka (June 30, 2011), Ex. F to Gollogly Decl.  This e-mail is false

in significant ways: the Defendants founded GenSpera in late 2003, immediately after Dr. Mhaka

shared her AMM9 results with them in confidence -- this e-mail certainly suggests that they had

just recently founded GenSpera as of 2011.  Nor were they just on the "sidelines."  More, the two

claimed AMM9 specifically in an office action in 2006, years earlier, another fact concealed.[5]

And GenSpera had been aggressively moving the drug into development for years before this

2011 e-mail.  Even this e-mail did not disclose that Drs. Denmeade and Isaacs had claimed

AMM9 in 2006; Dr. Mhaka would not learn that fact until much later.

    In a conversation after the events, Dr. Denmeade told his superior, Dr. Phillip Cole, that

GenSpera had deliberately left Dr. Mhaka off the application because including her "would have

complicated matters for licensing."  Cole Depo. at 72:15-16, Aug. 28, 2012, Ex. G to Gollogly

Decl.  That is, had she been acknowledged in a new AMM9 application, Drs. Denmeade and

Isaacs could not unilaterally exclusively license AMM9 to GenSpera.

    The majority of the above facts came to light during discovery in the case, largely

centering on the late August and October 2012 depositions of Drs. Denmeade and Isaacs, along

with the late summer document production from Counter-Claim Defendants.  Through this

discovery, it became plain that GenSpera and its agents Drs. Denmeade and Isaacs acted in bad

faith to misappropriate Dr. Mhaka's work, and did so in a fashion that would leave her without

---

[5]    Counter-Claim Defendants produced a privilege log showing hundreds of
communications between Drs. Isaacs, Denmeade, Dionne, and counsel in the years 2004-2008.
There was significant GenSpera activity.

recourse under the federal patent laws. As a result, it is simply inaccurate for Counter-Claim

Defendants to suggest that Dr. Mhaka should somehow have known about her claims for

constructive conversion, fraud, and unjust enrichment in 2006 or even 2008.

## IV.     THE LAW.

### A.     Summary Judgment and the Statute of Limitations.

A civil action at law must be filed within three years, measured "from the date it accrues

unless another provision of the code provides a different period of time within which an action

shall be commenced." Md. Code Ann., Cts. & Jud. Proc. § 5-101. This rule is qualified by the

"discovery rule," providing that the cause of action only accrues when the claimant knew or

reasonably should know of the wrong. *See Poffenberger v. Risser*, 431 A.2d 677, 680 (Md.

1981).

As a general rule, "whether a cause of action is barred by the statutes of limitations is

ordinarily a mixed question of law and fact that may be taken from the jury only when the court

determines as a matter of law that the suit was not instituted within the proper time." *James v.

Weisheit*, 367 A.2d 482, 486 (Md. 1977). "There being an absence of statutory direction, the

question when an accrues action is left to judicial determination." *Poffenberger*, 431 A.2d at

679. "This determination may be solely one of law, solely one of fact or one of law and fact."

*Id.* The question of when a civil action accrues is often a fact-bound inquiry.

Although "[s]ummary judgment unquestionably is an important device, for streamlining

litigation[,]" in that it "saves the parties expense and the delays of protracted and non-

meritorious litigation[,]" the "dismissal of [a] case deprives the parties of a trial and the

opportunity to develop their claims and present them to a jury." *Bank of America Corporation v.

Gibbons*, 918 A.2d 565, 569 (Md. Ct. Spec. App. 2007), *citing Sadler v. Dimensions Healthcare*

Case 1:12-cv-00772-MJG   Document 92   Filed 01/22/14   Page 20 of 41

*Corp.*, 836 A.2d 655, 670 (Md. 2003).  The Court of Appeals "has therefore been careful to restrict application of summary judgment to cases that present no material facts that may reasonably be said to be disputed." *Id.*  "The purpose of the summary judgment procedure is not to try the case or to decide the factual disputes, but to decide whether there is an issue of fact, which is sufficiently material to be tried[.]" *Jones v. Mid-Atl. Funding Co.*, 766 A.2d 617, 670 (Md. 2001).  "The Court has the exclusive power to determine the manner of operation of the discovery rule," but a trier of fact determines questions of fact on which a limitations defense turns.  *See Cooper v. Berkshire Life Insurance Co.*, 810 A.2d 1045, 1072 (Md. Ct. Spec. App. 2002) (*citing Pennwalt Corp. v. Nasios*, 550 A.2d 1155 (Md. 1988)).  *See also Frederick Rd. Ltd. P'ship v. Brown & Sturm*, 756 A.2d 963, 973-4 (Md. 2000).  ("[T]he question of notice generally requires the balancing of factual issues....").  "In some circumstances whether a reasonably prudent person should undertake a further investigation is a matter about which reasonable minds can differ, and is therefore a question of fact precluding summary judgment." *Cooper*, 810 A.2d at 1072.

The evidence considered are the "facts reflected in the pleadings, depositions, answers to interrogatories and affidavits in light most favorable to the non-moving parties the plaintiffs. Even if it appears that the relevant facts are undisputed, 'if those facts are susceptible to inferences supporting the position of the party opposing summary judgment, then a grant of summary judgment is improper.'" *Ashton v. Brown*, 660 A.2d 447, 452 (Md. 1995) (citations omitted).

The statute of limitations is an affirmative defense, and Counter-Claim Defendants bear the burden of persuasion.  *Newell*, 594 A.2d at 1156 ("the party raising a statute of limitations defense has the burden of proving that the cause of action accrued prior to the statutory time

13

limit for filing the suit."). On summary judgment, this means that Defendants must prove that the underlying causes of action in fact accrued and when. *Id.* This is a matter of proof, not merely assertion. *Id.*

Finally, claims arising from the same factual nexus are tolled by the filing of the first complaint. *See supra*, at n. 2. Here, this makes Dr. Mhaka's filing date March 12, 2012.

### B.   Statutes of Limitations and "Accrual".

A claim "accrues" for limitation purposes, when "all of the elements of a cause of action have occurred so that it is complete." *Trimper v. Porter-Hayden*, 501 A.2d 446, 452 (Md. 1985). *See also Litz v. Maryland Dep't of Environment*, 76 A.3d 1076, 1093 (Md. 2013), *Shailendra-Kumar, P.A. v. Dhanda*, 43 A.3d 1029, 1035-36 (Md. 2012) ("[I]n the context of the statute of limitations, '[t]he law is concerned with the accrual in the sense of testing whether all of the elements of a cause of action have occurred so that it is complete" (*quoting St. Paul Travelers v. Millstone*, 987 A.2d 116, 121 (Md. 2010)).

Maryland has adopted the "continuing harm" or "continuing violation" doctrine (*AAA Antiques Mall, Inc. v. Visa U.S.A. Inc., et al.*, 558 F. Supp. 2d 607 (D. Minn. 2008)), which:

> [t]olls the statute of limitations in cases where there are continuous violations. *See Shell Oil*, 265 Md. at 636, 291 A.2d at 67; *see also Edwards v. Demedis*, 118 Md.App. 541, 562, 703 A.2d 240, 250 (1997). Under this theory, violations that are continuing in nature are not barred by the statute of limitations merely because one or more of them occurred earlier in time. *See Shell Oil*, 265 Md. at 636, 291 A.2d at 67; *see also Duke Street Ltd. P'ship v. Bd. of Cty. Comm'rs,* 112 Md.App. 37, 50, 684 A.2d 40, 47 (1996) (noting that "[c]laims that are in the nature of a `continuous tort,' such as nuisance, can extend the period of limitations due to their new occurrences over time").

*MacBride v. Pishvaian,* A.2d 233, 240 (2007). Continuing violations that qualify under this theory include "continuing unlawful acts" (*AAA Antiques*, 558 F. Supp. 2d 607). *See also Litz*, 76 A.3d at 1076. Conversion may constitute a "continuing tort" for purposes of limitations. *See*

*Roberta L. Marcus, Inc. v. New Cingular Wireless*, No. 12-20744 2013 WL5554142, at *7 (S.D. Fla. Sept. 3, 2013).

The continuing harm doctrine applies to unjust enrichment as well as to tort claims. *AAA Antiques Mall*, 588 F. Supp. 2d at 607. As defendants state in their brief, the statute of limitations for unjust enrichment claim accrues when "plaintiff *last* provided monetary benefits" to the defendants. Def. Br. at 6, citing *Ahmad v. Eastpines Terrace Apartments, Inc.*, 28 A.3d 1, 9 (Md. Ct. Spec. App. 2011).

### C.   Dr. Mhaka's State Tort Claims.

Dr. Mhaka asserts tort claims for conversion, constructive fraud, and unjust enrichment, each of which is governed by Maryland law.

- **Elements of Conversion:** "Conversion is an intentional tort, consisting of two elements, a physical act combined with a certain state of mind." *Darcars Motors of Silver Spring, Inc. v. Borzym*, 818 A.2d 1159, 1169-70 (Md. Ct. Spec. App. 2003) *aff'd*, 841 A.2d 828, 836 (Md. 2004). It is defined as "any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it." *The Redemptorists v. Coulthard Servs., Inc.*, 801 A.2d 1104, 1127 (Md. 2002) (quoting *Interstate Ins. Co. v. Logan*, 109 A.2d 904, 907 (Md. 1954)). The "act of ownership for conversion can occur either by initially acquiring the property or by retaining it longer than the rightful possessor permits." *Darcars Motors*, 841 A.2d at 835; *Lasater v. Guttmann*, 5 A.3d 79, 88 (Md. Ct. Spec. App. 2010).

The three-year statute of limitations applies to conversion. *Llanten v. Cedar Ridge Counseling Ctrs., LLC*, 75 A.3d 1030, 1034 (Md. Ct. Spec. App. 2013). The action does not accrue until all elements are present, including damages.

15

- **Elements of constructive fraud**: "We have also defined constructive fraud as a 'breach of a legal or equitable duty which, irrespective of the moral guilt of the fraud feasor, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests.'" *Md. Envtl. Trust v. Gaynor*, 803 A.2d 512, 517 (Md. 2002) (*quoting Ellerin v. Fairfax Sav.*, 652 A.2d 1117, 1126 n. 11 (Md. 1995)) and *Canaj, Inc. v. Baker & Div. Phase III*, 891 A.2d 1067, 1095 (Md. 2006). "Neither actual dishonesty of purpose nor intent to deceive is an essential element of constructive fraud." *See Ellerin*, 652 A.2d at 1127 n. 11.

The three-year statute of limitations applies to constructive fraud. *See Moreland v. Aetna U.S. Healthcare, Inc.*, 831 A.2d 1091, 1095 (Md. Ct. Spec. App. 2003) (applying § 5-101 a constructive fraud claim); *Fairfax Sav., F.S.B. v. Weinberg & Green*, 685 A.2d 1189, 1204 (Md. Ct. Spec. App. 1996). Accrual also requires compensable damages.

- **Elements of unjust enrichment**: "Unjust enrichment consists of three elements: (1) a benefit conferred upon the defendant by the plaintiff; (2) and appreciation or knowledge by the defendant of the benefit; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." *Hill v. Cross-Country Settlements, LLC*, 936 A.2d 343, 351 (Md. 2007) (*citing Barry & Gould, P.A. v. Berry*, 757 A.2d 108, 113 (Md. 2000) (quoting *County Comm'rs v. J. Roland Dashiell & Sons, Inc.*, 747 A.2d 600, 607 n. 7 (Md. 2000)).

The three-year statute of limitations applies to unjust enrichment. *See Ahmad*, 28 A.3d at 1 ("Because appellant sought the relief of repayment of money, his unjust enrichment claim was a claim 'at law' and thus the three-year statute of limitations established by C.P. § 5-101 applied.").

16

D.   **The "Discovery Rule".**

Maryland applies the "discovery rule" in determining when an action accrues. *Bank of N.Y. v. Sheff*, 854 A.2d 1269, 1275 (Md. 2004). Under Maryland's discovery rule, the cause of action accrues when the plaintiff in fact knew (express knowledge) or reasonably should have known (constructive knowledge) of the wrong. *Lumsden v. Design Tech Builders*, 749 A.2d 796, 802 (Md. 2000) (quoting *Poffenberger*, 431 A.2d at 680). The application of the discovery rules turns on two key inquiries: (1) the meaning of "know" or "should know" and (2) the meaning of "wrong." *Chesapeake Bay Foundation v. Weyerhaeuser Co.*, 849 F. Supp. 2d 570, 579 (2012).

Express actual notice "contemplates... express cognition." *Poffenberger*, 431 A.2d at 681. Thus, "[e]xpress notice embraces not only knowledge, but also that indicated by direct information, either written or oral, from those who were cognizant of the fact communicated." *Id.*

Implied actual notice contemplates the conclusion that a plaintiff has notice of the probable cause in general nature of the complained - of injury and almost invariably compels the conclusion that the plaintiff can assert a "potentially actionable legal claim." *Chesapeake Bay Foundation*, 849 F. Supp. 2d at 582.

"In making a determination as to when the statute of limitations accrues in a particular circumstance, a court must do so 'with awareness of the policy considerations unique to each situation.'" *Doe v. Archdiocese of Wash.*, 689 A.2d 634, 639 (Md. Ct. Spec. App. 1997) (quoting *Hecht v. Resolution Trust Corp.*, 635 A.2d 394 (1994)). As this Court has instructed:

> Although the plaintiff's interest in access to the courts and the
> defendant's interest in repose often counterbalance, this balance
> tips in favor of Weyerhaeuser in view of this case's undisputed
> facts. Unlike many of the cases in which the discovery rule took
> root, this case does not involve a relationship of trust between a

17

weaker and a stronger party. *Chesapeake Bay Foundation*, 849 F.
Supp. 2d at 587 (*citing Pennwalt*, 550 A.2d at 1155).

This Court has long held that a defendant's reliance on the running of limitations "should

not be sanctioned by a Court" where it "would be unjust and inequitable." *Murphy v.*

*Merzbacher*, 697 A.2d 861, 877 (Md. 1997) *citing Steuart v. Carr*, 6 Gill 430, 440 (1848). The

Courts have applied "[t]he ancient maxim that no one should profit by his own conscious wrong"

to preclude defendants from relying on the bar of limitations. *Id.* at 880, *Bayshore Industries v.*

*Ziats*, 192 A.2d 487, 493 (Md. 1963).

When stealth, subterfuge, or other difficulties of detection leave the plaintiff "blamelessly

ignorant," of the facts and circumstances legally entitling her to relief, the statute does not begin

to run unless she knows or through exercise of reasonable diligence should know of the wrong.

*Doe v. Maskell*, 679 A.2d 1087, 1089 (Md. 1996). Thus, a "discovery rule" of the accrual action

is a recognition that the Legislature never intended to close its courts to plaintiffs unaware of

their injuries. *Harig v. Johns-Manville Prods.*, 394 A.2d 299, 305 (Md. 1978).

**E.    Equitable Tolling; Equitable Estoppel.**

It has been held that equitable tolling applies if the plaintiff is actually misled by the

defendant. *See American Jurisprudence 2d Limitations of Actions* § 174 (2007). While the

doctrines of equitable tolling and estoppel are distinct, they have a common origin and "are

based primarily on the view that a defendant should not be permitted to escape liability by

engaging in misconduct that prevents the plaintiffs from filing her claim on time." *Prelich v.*

*Medical Resources, Inc.*, 813 F. Supp. 2d 654, 663 (D.Md. 2011). "To invoke equitable tolling,

the plaintiff must therefore show that the defendant attempted to mislead [her]" as to whether

there was a factual basis for filing a claim, "and that the plaintiff reasonably relied on this

18

misrepresentation by neglecting to file a timely charge." *English v. Pabst Brewing Co.*, 828 F.2d 1047, 1049 (4th Cir. 1987).

The three-year statute of limitations can be tolled by fraud under § 5-203 of the Courts & Judicial Proceeding Article:

> If the knowledge of a cause of action is kept from a party by the fraud of an adverse party, the cause of action shall be deemed to accrue at the time when the party discovered, or by the exercise of ordinary diligence should have discovered the fraud.

The three-year statute of limitations can also be tolled if a "confidential relationship" exists between the parties. Where a confidential relationship exists, the statute of limitations will be tolled pursuant to Section 5-203 if: (1) the relationship continues unrepudiated, (2) there is nothing to put the injured party on inquiry, and (3) the injured party cannot be said to have failed to use due diligence in detecting the fraud. *Frederick Rd. Ltd. P'ship*, 756 A.2d at 975.

An equitable estoppel inquiry focuses on whether "the defendant engages in intentional misconduct to cause the plaintiff to miss the filing deadline, even though the plaintiff knows that it exists." *Prelich*, 813 F. Supp. 2d. at 663.

Estoppel is merely the act of lulling a party into not filing a lawsuit. Defendants are deemed estopped from asserting statute of limitations as a defense. GenSpera cannot use the statute of limitations as a sword to benefit from its own conduct which induced Dr. Mhaka to delay filing suit. Proof of actual fraud or bad faith is not required; the basic inquiry is whether defendant's actions "have lulled her into a false sense of security and so induced the plaintiff not to institute suit in the requisite time period." The Maryland Court has recently adopted a definition of equitable estoppel:

> Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded both at law and in equity, from asserting rights which might perhaps have otherwise existed, either

19

> of property, of contract, or of remedy, as against another person,
> who has in good faith relied upon such conduct, and been led
> thereby to change his position for the worse and who on his part
> acquires some corresponding right, either of property, of contract,
> or of remedy. *Hill*, 936 A.2d at 343.

Equitable estoppel essentially consists of three elements: "voluntary conduct or representation,

reliance, and detriment." *Id.* at 364.

## V.   **ARGUMENT.**

Contrary to Counter-Claim Defendants' unsupported assertion, Dr. Mhaka's state court

claims did not accrue in late 2006. At that point, Counter-Claim Defendants had not yet

converted Dr. Mhaka's invention, just as the Counter-Claim Defendants had not then been

unjustly enriched. For that matter, even were these conclusions otherwise, the statute would

have been tolled by Counter-Claim Defendants' affirmative misrepresentations.

### A.   **Mhaka's Claim for Conversion Did Not Accrue Before the Limitations Period.**

A proper analysis of whether Dr. Mhaka's conversion claim accrued in November 2006

must begin with an analysis of the elements of the conversion cause of action. Under Maryland

law, conversion is perfected with the wrongful exercise of dominion and control over the

property:

> Initially, the Court of Appeals spoke of conversion as the wrongful
> taking or asportation of a chattel with the intent by the taker to
> appropriate it to his own use. *See Harker v. Dement*, 9 Gill 7, 17
> (1850). Later cases, however, have made clear that the gist of the
> tort is not necessarily the manner of acquisition of the property by
> the defendant, **but rather his wrongful exercise of dominion
> over it**. *See Kirby v. Porter*, 125 A. 41 (Md. 1923); *Saunders*, 72
> A.2d at 720. That may involve nothing more than the improper
> withholding of the property from the rightful owner…."

*Kalb v. Vega*, 468 A.2d 676, 683 (Md. Ct. Spec. App. 1983) (emphasis supplied). In *Saunders*,

the Court of Appeals noted that **the tort of conversion covers not only the initial acquisition of**

**the personal property of another but also the subsequent exerting of unauthorized control over the property**:

> [T]he gist of a conversion is not the acquisition of the property by the wrongdoer, **but the wrongful deprivation of a person and property to the possession of which he is entitled.** Nor need there exist a forcible dispossession of property to constitute an act of the defendant a conversion.

*Saunders*, 72 A.2d at 722; *see also Lawrence v. Graham*, 349 A.2d 271, 274-75 (Md. 1975); *Darcars*, 841 A.2d at 828.

Counter-Claim Defendants did not exercise dominion and control over Dr. Mhaka's inventive work in November 2006, GenSpera's preferred accrual date. Their application claiming AMM9 was simply an application, and an application confers no rights. *See St. John's Univ.*, 757 F. Supp. 2d at 144, *citing General Electric Co. v. Wabash Appliance Corp.*, 304 U.S. 364, 369 (1938). The application alone did not give Counter-Claim Defendants dominion over Dr. Mhaka's invention, and had Dr. Mhaka filed suit for conversion in early 2007, the Counter-Claim Defendants' 12(b)(6) or demurrer would have been granted.

Apart from this accrual question, Dr. Mhaka did not suffer compensable injury in 2006. That came much later, as discussed below.

Nor did Dr. Mhaka's conversion claim accrue when the first patent issued, on December 23, 2008. Oddly, this is not the first time this issue has arisen in Maryland. In *Edwards v. Gramling Eng'g. Corp.*, 588 A.2d 793, 798 (Md. 1991), the issue was whether the issuance of a patent alone constituted conversion. The court held not, reasoning that the "mere fact that (the defendant) applied for a patent in its own name may not have amounted to a conversion and may not initially have been improper." *Edwards* stands for the proposition that obtaining a patent in one's own name is not conversion as it does not necessarily show a "tortious" taking of property.

21

For that matter, even if the date of **issuance of the patent** represented the date of accrual of the causes of action, **it is undisputed that for one of the two patents on AMM9, the '648 patent, that patent was not issued until August 3, 2010.** Counter-Claim Defendants cannot possibly claim that the cause of action for conversion, or the causes for constructive fraud, and unjust enrichment for the aspects of the invention claimed in the '648 patent, are barred by the statute of limitations, because the patent did not even issue until well within the three-year limitations period. Nor can GenSpera claim that the '648 patent somehow does not count or was subsumed within the first, '354 patent, because Drs. Denmeade and Isaacs, in obtaining the ' 648 patent, represented to the USPTO that the invention claimed in that method patent, indisputably including AMM9, was novel and separate from the first patent (otherwise the second patent would have been invalid for double-patenting).

To the contrary, the first ever arguable act of ownership or dominion was the exclusive license granted to GenSpera of the patents-in-suit, which occurred in April, 2011. Dr. Mhaka first discovered the exclusive license in discovery in the litigation. She had no actual or constructive notice of this event until well within the limitations period.

In law and fact, Counter-Claim Defendants did not exercise dominion over the issued patents before they refused to add Dr. Mhaka to the issued patents on September 30, 2012. This was the first instance that Dr. Mhaka was permanently deprived of her rights and legal interest in her invention because Counter-Claim Defendants asserted rights inconsistent with her rights. *See Edwards*, 588 A.2d at 793.

Finally, Counter-Claim Defendants are incorrect when they argue that Dr. Mhaka has conceded that Dr. Mhaka's state law claims accrued in late 2006. The state complaint makes clear that the state tort claims were only perfected once Counter-Claim Defendants established

22

that Dr. Mhaka could not be added as an inventor to the patents-in-suit by conceding her that

very status.  Had Dr. Mhaka been able to correct inventorship in 2012, there would have been,

*e.g.*, **no conversion, constructive fraud or unjust enrichment as she would have been listed**

**as a co-inventor and received the resultant benefits: she would have rights for ideas**. *See*

*Edwards*, 588 A.2d at 793.  To quote the Complaint which is incorporated in the conversion,

fraudulent conveyance and unjust enrichment claims:

> GenSpera has admitted the failings of the Patent Act to provide Dr.
> Mhaka relief.  On March 12, 2012 GenSpera filed a declaratory
> action against Dr. Mhaka in the U.S. District Court for the District
> of Maryland.  Dr. Mhaka counter-claimed seeking to be added as a
> named inventor on the Patents pursuant to 35 U.S.C. § 256.  In
> seeking leave to file the summary judgment motion on the inability
> of the District Court to grant Dr. Mhaka relief under 35 U.S.C. §
> 256, GenSpera admitted that the international application for the
> patents at issue was filed on November 30, 2001, and for the
> limited purposes of GenSpera's summary judgment motion, that
> "Dr. Mhaka, after 2001, contributed to the patents in a significant,
> material, inventive way in connection with the compound G-202,
> also referred to as AMM9, included in claim 1 of both patents that
> were issued."  **In so doing the Defendants closed the loop on**
> **their wrongs against Dr. Mhaka and have perfected her state-**
> **based claims for relief....**

Comp. at ¶ 87 (emphasis added).  Counter-Claim Defendants ignore this very specific allegation.

> **B.   Mhaka's Claim for Constructive Fraud Did Not Accrue Before the**
> **Limitations Period.**

"Ordinarily we leave the question of whether a plaintiff knew or should have become

aware of a fraud to the jury." *Beneficial Standard Life Ins. v. Madariaga*, 851 F.2d 271, 275 (9th

Cir. 1988).  Summary judgment is appropriate only where a jury could not reasonably find for

the plaintiff on this issue.  *Id.*  Where there are disputed questions of facts or facts susceptible to

opposing inferences as to when the statute of limitations for fraud commence, summary

judgment is not appropriate.

Drs. Denmeade and Isaacs fraudulently concealed the true state of affairs from Dr.

Mhaka, as described in the Statement of Facts.  More, Drs. Denmeade and Isaacs were Dr.

Mhaka's thesis advisors, mentors and fiduciaries; she was their student, dependent upon them for

progress toward her doctorate.  Drs. Denmeade and Isaacs had access to her lab notebooks, the

lab records generally, and the test results confirming her work; she did not.  Dr. Mhaka as a

university graduate student was prevented from effectively protecting her interests.  *See Atlantis

Information Tech. v. CA, Inc.*, 485 F. Supp. 2d 224, 231 (E.D.N.Y. 2007).

Dr. Denmeade conceded that he stood in a position of trust and confidence as to Mhaka:

> I have been a member of the thesis committee serving as an
> advisor, and in Annastasiah's case, I was the -- the mentor, so I had
> a slightly different role than the other members of the thesis
> committee because I was there mostly to listen to what they said,
> to help advise Annastasiah as she pursued her doctorate.

*See* Denmeade Depo. at 103:3-9, Aug. 31, 2012, Ex. A to Gollogly Decl.

Under the circumstances, Drs. Denmeade and Isaacs were fiduciaries to Dr. Mhaka as to

the invention and their efforts to obtain a patent and owed her a duty to fully disclose material

facts.  "It is well settled that when there is a duty to speak, silence may very well constitute

fraudulent concealment, which is itself the equivalent of affirmative misrepresentations of fact."

*Guardian Life Ins. v. Handel*, 190 A.D. 2d 57, 61 (N.Y. App. Div. 1993).  Constructive fraud

includes "a fiduciary's simple nondisclosure of facts it is obligated to disclose," in the absence of

an intent to deceive.  *Whitney Holdings, Ltd. v. Givotovsky*, 988 F.Supp. 732, 744 (S.D.N.Y.

1997).  Dr. Mhaka has alleged that Drs. Denmeade and Isaacs failed to disclose material facts

relating to their collective invention in order to prevent Dr. Mhaka from asserting her rights to

the invention, and to keep the patents and resultant stock options and royalties for themselves.

The determination of whether a confidential relationship exists is ordinarily a question of fact. *See Sanders v. Sanders*, 274 A.2d 383, 388 (Md. 1971) ("In the absence of the legal presumption which arises from certain relationships… the existence of a confidential relationship is a question of fact, not of law."). "Under Maryland law, a confidential relationship is created whenever confidence is reposed by one person in and accepted by another [citations omitted]." *Finch v. Hughes Aircraft Co*., 469 A.2d 867 (Md. Ct. Spec. App. 1984). "Such a relationship may arise where a party is, under the circumstances, justified in believing that the other party will not act in a manner adverse or inconsistent with the reposing party's interest or welfare. It extends to all relations in which confidence is reposed, and in which dominion and influence resulting from such confidence maybe exercised by one person over another." *Id., citing Midler v. Shapiro*, 364 A.2d 99, 104 (Md. Ct. Spec. App. 1976).

It is not controverted that both Drs. Isaacs and Denmeade were Dr. Mhaka's mentors. *See* Denmeade Depo. at 103:3-9, Aug. 31, 2012, Ex. A to Gollogly Decl.; Isaacs' Responses to Mhaka's First Set of Interrogatories at No. 3, Ex. H to Gollogly Decl. Redacted It is further not controverted that Dr. Mhaka's mentors' took on the task of addressing Dr. Mhaka's 2004 question with regards to inventorship. Dr. Denmeade told Dr. Mhaka that Redacted *See* e-mail from Denmeade to Mhaka, May 12, 2004, Ex. B to Gollogly Decl. Redacted (*see* Mhaka Depo. at 511:5-14, Dec. 12, 2013, Ex. I to Gollogly Decl.). *See* Ex. B. Dr. Denmeade then told his student that:



*Id.*[6] Dr. Mhaka, understandably, placed faith in her mentor's assessment. *See* Mhaka Depo. at 337:18-338:16, 425:22-426:24, 428:2-429:22, 510:11-511:3, 511:15-512:2 and 512:18-25, Dec. 12, 2013, Ex. I to Gollogly Decl.

Accordingly, Dr. Mhaka's cause of action for constructive fraud accrued when Counter-Claim Defendants completed their breach of fiduciary duty by refusing to add her to the patents as an inventor and exclusively licensing the patents to GenSpera. Drs. Denmeade and Isaacs misappropriated her invention and insured that Dr. Mhaka cannot reclaim her property through correcting inventorship, which injured and caused damage to Dr. Mhaka.

As with the tort of conversion, filing a patent application in one's own name, and even obtaining the patent in one's name, is not necessarily tortious, and does not start the statute of limitations running. *See Edwards*, 588 A.2d at 793. Dr. Mhaka's cause of action for constructive fraud could not have begun to run before the Counter-Claim Defendants refused to add her to the patents in 2012, well within the limitations period. Conversely, even if the Counter-Claim Defendants' earlier conduct was tortious, it was part of a course of continuing violation and harm that continued well into the limitations period and culminated with Counter-Claim Defendants' refusal to add Dr. Mhaka to the patents in 2012.

---

[6]   Dr. Isaacs stated ~~Redacted~~ *See* Isaacs' Responses to Mhaka's First Set of Interrogatories at No. 12, Ex. H to Gollogly Decl.

More, as outlined above, Counter-Claim Defendants completely ignore the fact that they

sought and obtained *two* patents on Dr. Mhaka's inventions, so that even assuming (contrary to

law) that obtaining a patent caused a tort cause of action to accrue, accrual could not have

occurred before the '648 patent *issued in 2010*, well within the limitations period. The

constructive fraud claim, like the conversion claim, cannot possibly be barred by the statute of

limitations for this reason as well.

### C.    Mhaka's Claim for Unjust Enrichment Did Not Accrue Before the Limitations Period.

Under Maryland unjust enrichment law, plaintiff must establish that the defendant holds

plaintiff's money and it would be unconscionable for him to retain it. *Pitt v. Greenberg*, 219

A.2d 237, 241 (Md. 1966). A claim of unjust enrichment is established when: (1) the plaintiff

confers a benefit upon the defendants; (2) the defendant knows or appreciates the benefit; and (3)

the defendant's acceptance or retention of the benefit under the circumstances is such that it

would be inequitable to allow the defendant to retain the benefit without paying of value in

return. *Benson v. State*, 887 A.2d 525, 546 (Md. 2005), quoted in *Jackson v. 2109 Brandywine,*

*LLC*, 952 A.2d 304, 327 (Md. Ct. Spec. App. 2008). "A person confers a benefit upon another if

he gives to the other possession of or some other interest in money." *Bank of America*

*Corporation*, 918 A.2d at 565 (*citing* Restatement of Restitution § 1 Cmt. a).

The cause of action for unjust enrichment here could not accrue before all of these

elements were satisfied. Here, the Counter-Claim Defendants sought to benefit from the patents

by Drs. Denmeade and Isaacs exclusively licensing them to GenSpera. GenSpera, Dr.

Denmeade and Dr. Isaacs will benefit monetarily from the profits and royalties from making and

selling the patented drugs. **That exclusive license did not come into being until 2011**, and the

27

drug-sale profits and royalties, evidently, are yet to come. Accordingly, the cause of action for the unjust enrichment constituting the exclusive license could not have accrued before 2011.

More, the enrichment became "inequitable" (the third element of the cause of action), only when Counter-Claim Defendants refused to add Dr. Mhaka as an inventor in 2012. That is when they refused to share the benefits rightly belonging to Dr. Mhaka, and thus unjustly enriched themselves.

Counter-Claim Defendants agree that a claim for unjust enrichment accrues when "plaintiff *last* provided monetary benefits" to the defendants. Def. Br. at 6, *citing Ahmad v. Eastpines Terrace Apartments, Inc.*, 28 A.3d 1, 9 (Md. Ct. Spec. App. 2011). Here, it is impossible to argue that the cause of action accrued before the *critical* benefit—the exclusive license to the patents so as to make and sell patented drugs, which was the whole point of Counter-Claim Defendants' scheme—was conferred, leading to potentially huge profits and royalties to come.

Here again, even if the Counter-Claim Defendants are deemed to have obtained a benefit from their illegal scheme before the exclusive license, the indisputable facts that the scheme continued, and resulted in the exclusive patent license, tolls the running of the statue of limitations under the continuing harm/continuing violation doctrine. *See Edwards*, 588 A.2d at 793.

**D.     The Claims Are Not Barred Pursuant to the Discovery Rule; There Was No Actual Notice in 2008 and No Fair Constructive Notice.**

None of the causes of action accrued before the limitations period, for the reasons described above. In addition, the discovery rule prevents the statute from running to bar these claims.

Counter-Claim Defendants argue that Dr. Mhaka's state-law tort claims are barred at the latest "[b]y the close of 2008 (when the application itself had published)," as Dr. Mhaka was on "inquiry notice" of her grievance and "reasonably should have known" that the pending application had been amended, as she suspected months earlier." Def. Br. at 9. The "grievance" that Counter-Claim Defendants argue is the issuance of the '354 patent on December 23, 2008 (Counter-Claim Defendants ignore the later issuance of the '648 patent issued on August 3, 2010) and not the state-law tort claims which did not accrue until years later, after the patents issued. But even when a patent has been published, courts are reluctant to grant summary judgment as to notice of accrual of a cause of action. In reversing a District Court's order granting defendants' motion for summary judgment because it erroneously held that all claims (including conversion and fraud) were barred by a three-year statute of limitations, the Court of Appeals held that there was a genuine issue of material fact regarding constructive notice as it was not "[c]lear that a reasonable person would investigate merely because this patent was issued." *General Bedding Corporation v. Echevarria*, 947 F.2d 1395, 1398 (9th Cir. 1991). In *Advanced Cardiovascular Systems, Inc. v. Scimed Life Systems, Inc.*, 988 F.2d 1157, 1162-63 (Fed. Cir. 1993), the court concluded "that the district court erred, as a matter of law, in measuring [plaintiff's] delay from the date of issuance of the patent, in the absence of proof that [plaintiff] knew or should have known that the patent had issued and that he was omitted as a joint inventor." Similar to Dr. Mhaka, after the plaintiff there helped to develop the invention (a catheter) he "was not further involved in any of the catheter work that followed" and did not know that a patent had been obtained. *Id.*

Constructive notice is *a question of fact*; how can Counter-Claim Defendants establish, as a matter of law, that Dr. Mhaka should reasonably have been on inquiry notice, when they

29

misrepresented and concealed virtually every material fact, such as that they were applying for a patent for her co-invention and that they had started the GenSpera company to commercialize that invention?  More, Dr. Mhaka could not have been on notice that Counter-Claim Defendants were not going to add her to the patent until 2012, when they refused to do so.

Finally, while Counter-Claim Defendants try to create the impression that Dr. Mhaka was familiar with the nuances of patent law and researching patent databases in June to October 2008, *see* Counter-Claim Defendants' Memorandum (Dkt. No. 83-1) at 4, the truth is otherwise. In 2008, Dr. Mhaka worked for a life sciences incubator company known as Acidophile.  Dr. Mhaka's evaluation of companies and technology focused on the technical aspects of an offering and not on whether a technology was protected.[7]  As corroborated by her former employer, Dr. Goelet:

> Dr. Mhaka's primary responsibility was more on evaluating the feasibility, the technical feasibility of a project than on determining either the patentability or the freedom to operate. I had somebody else in the team who had worked in a technology transfer office who developed more skills and experience in that area. And the other area where Dr. Mhaka had a fairly important role in the analysis was the market research.

Goelet Depo. at 42:2-11, Oct. 25, 2013, Ex. J to Gollogly Decl.; *see also id.* at 39:3-14, 42:11-22, 43:14-20 & 45:13-21.

In mid-2008, Dr. Mhaka attempted to check on the status of the application she had seen in 2004, to the best of her ability.  She discovered nothing new - there was a prodrug patent application pending. *See* Mhaka Depo. at 421:19-23, Dec. 12, 2013, Ex. I to Gollogly Decl.  She

---

[7]     Similarly, Dr. Mhaka's involvement in "draf[ing] multiple patent applications," *see* Counter-Claim Defendants Memorandum (Dkt. No. 83-1) at 4, was limited to providing relevant information with a colleague interacting with patent counsel on the prosecution drafting. *Cf.* Goelet Depo. at 47:19-49:6, Oct. 25, 2013, Ex. J to Gollogly Decl. Further, Dr. Mhaka's first experiences here, did not arise until 2009/2010. *Cf.* Goelet Depo. at 47:14-49:6, Oct. 25, 2013, Ex. J to Gollogly Decl.

was unable to, as would be expected of most people, access (much less assess) the application

and its prosecution history. *See* e-mail from Mhaka to Goelet, Jun. 26, 2008, Ex. K to Gollogly

Decl.; *see also* Mhaka Depo. at 393:1-394:17, Dec. 12, 2013, Ex. I to Gollogly Decl. A few

months later she learned of a single piece of additional, but non-confirmable, information—it

was possible that Dr. Denmeade did not speak to the JHU Technology Office's Keith Baker in

2004. *See* Baker to Mhaka, Oct. 15, 2008, Ex. L to Gollogly Decl. ("Annastasiah, I am not

aware of any question about inventorship until your recent inquiry. Kb"); *see generally* Mhaka

Depo. at 523:17-524:24, Dec. 12, 2013, Ex. I to Gollogly Decl. Nothing in this fairly puts her on

inquiry notice, and certainly not as a matter of law.

### E. Limitations Were Tolled by Counter-Claim Defendants' Affirmative Misrepresentations (and Concealment) Pursuant to Equitable Tolling and Equitable Estoppel.

Dr. Denmeade, Dr. Mhaka's own faculty advisor, and Dr. Isaacs, did everything they

could to mislead Dr. Mhaka and prevent her from knowing about and bringing her claim. They

told her work that she had done for them was not good enough to publish, and they told her not

to publish it, in order to keep the invention non-public and therefore patentable. At the same

time, they were planning to file a patent application on it, and concealed that fact from Dr.

Mhaka. They kept her in the dark for years, with a variety of excuses and lies, while they were

hard at work, forming GenSpera in their effort to commercialize the invention. If they were

honest with their student, they would have told her the truth, that AMM9 was patentable, an

expected gold mine, for which they were hard at work pursuing a patent, and most of all, that

they had no intention of adding her to the patents when they issued. This fraud never ceased as,

for example, in 2011, Dr. Denmeade e-mailed Dr. Mhaka to suggest that he and Isaacs had just

founded GenSpera, and that the company's business was based on recent research work. Dr.

Mhaka had to wait until 2012, when she finally asked them point-blank, and they refused to

agree to her having any interest in her invention.  This is an outrage and a dramatic example of

what the equitable doctrines of tolling and estoppel are intended to protect against.  *See* above, §

III.B.  Certainly, whether GenSpera's lies and concealment should toll the statute certainly

presents a question of fact for the jury.

## VI.    CONCLUSION.

For the reasons set forth above, Dr. Mhaka respectfully requests that Drs. Denmeade's

and Isaacs' Motion for Summary Judgment and GenSpera, Inc.'s joinder in the Motion, be

denied.

Dated:  January 22, 2014

*/s/ Ezra S. Gollogly*

Philip M. Andrews (Federal Bar No. 00078)
Ezra S. Gollogly (Federal Bar No. 28088)
Katrina J. Dennis (Federal Bar No. 27893)
Kramon & Graham, P.A.
One South Street
Suite 2600
Baltimore, Maryland 21202
pandrews@kg-law.com
egollogly@kg-law.com
kdennis@kg-law.com
Phone: (410) 752-6030
Fax:  (410) 539-1269

Spencer Hosie (admitted *pro hac vice*)
Diane S. Rice (admitted *pro hac vice*)
Darrell R. Atkinson (admitted *pro hac vice*)
Hosie Rice LLP
Transamerica Pyramid, 34th Floor
600 Montgomery Street
San Francisco, CA 94111
shosie@hosielaw.com
drice@hosielaw.com
datkinson@hosielaw.com
Phone: (415) 247-6000
Fax: (415) 247-6001

*Attorneys for Defendant and Counter-*
*Plaintiff Annastasiah Mudiwa Mhaka*

33

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 22nd Day of January, 2014, I filed the foregoing:

DEFENDANT AND COUNTER-CLAIM PLAINTIFF'S OPPOSITION TO COUNTER-

CLAIM DEFENDANTS DENMEADE'S AND ISAACS' MOTION FOR SUMMARY

JUDGMENT via the Court's CM/ECF system, which will deliver electronic notice to each party

and that I additionally served it by e-mail to those below.  I further certify that the

UNREDACTED VERSION OF THE FOREGOING, which was filed under seal, was also sent

via e-mail on the 22nd Day of January, 2014, to:

> John E. Nilsson, Esquire
> Matthew M. Wolf, Esquire
> Seth I. Heller, Esquire
> Arnold and Porter LLP
> 555 12th Street NW
> Washington, DC 20004
> John.Nilsson@aporter.com
> Matthew.Wolf@aporter.com
> Seth.Heller@aporter.com
>
> Wallace Wu, Ph.D., Esq.
> Arnold and Porter LLP
> 44th Floor
> 777 South Figueroa Street
> Los Angeles, CA 90017
> Wallace.Wu@aporter.com
>
> *Counsel for Plaintiff and Counterclaim-
> Defendant GenSpera, Inc. and Counterclaim-
> Defendants Dr. John Isaacs, and Dr. Sam
> Denmeade*
>
>                    */s/ Ezra S. Gollogly*
>                    Ezra S. Gollogly

34